Vernon Keith FRANKS *v.* STATE of Arkansas

CR 90-265                                    811 S.W.2d 301

Supreme Court of Arkansas
Opinion delivered June 17, 1991

*David R. Goodson*, Greene County Public Defender, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandra Moll*, Asst. Att'y

Gen., for appellee.

DAVID NEWBERN, Justice. Vernon Keith Franks appeals from his conviction of murdering his grandmother, Lou Emma Franks. He contends the Trial Court erred in failing to grant his motion for acquittal due to mental incapacity at the time the crime was committed. He also argues he was entitled to a directed verdict on that issue. In addition, Franks contends a statement he made while in custody should not have been admitted into evidence and the Court erred by not declaring a mistrial because the jury obtained a dictionary for the purpose of looking up the definition of "premeditated" without notice to the Court or counsel.

We affirm the conviction because, (1) the statute allowing a court to dismiss a charge due to mental incapacity is permissive only, (2) there was evidence on which the jury could base its decision that Franks was not mentally incapacitated at the time of the crime, (3) there was evidence from which the court could have concluded that the statement Franks made while in custody was voluntary, resulting from an initiation by Franks of a conversation with a police officer despite the fact that Franks had earlier insisted on "taking the Fifth" and speaking with a lawyer, and (4) the jury's procurement of a dictionary without notice to the court or the parties was improper, but no prejudice resulted.

Allen Hicks was an investigator with the Greene County Sheriff's Department. He testified he was called on September 9, 1988, to a residence occupied by the appellant, Keith Franks, and Lou Emma Franks. Mrs. Franks' body had been found in the yard outside the house lying under a bush. Her head was severely lacerated, and she had blood splashes on her feet. Hicks examined the area and it did not appear to him that a struggle had taken place in the vicinity of the body, nor did it appear that the body had been dragged there.

Hicks went to the residence where he found Keith Franks in the kitchen speaking to Franks' mother on the telephone. Franks was saying to his mother that his grandmother was dead and apparently had been shot. Hicks asked if Franks knew what had happened to his grandmother, and Franks said he had heard her go out with the dog but she had not returned for about an hour, and he had gotten worried and called relatives to help him look for

her, although he had not gone outside to search. Hicks read Franks his rights and told Franks he would like him to come to the sheriff's department to give a formal statement. At that, Franks replied that if he were going to the station he would "plead the Fifth" and wanted to speak to a lawyer. He was taken to the department by another officer.

Hicks and other officers remained at the residence. They found a number of areas and items in the house on which there were stains they suspected to be blood stains. Wet clothing was found on a closet floor, and part of the carpet was wet where apparently there had been an attempt to wash out the stains. Stained towels were found in a dryer. The items and places were later analyzed and found to contain blood.

When Hicks arrived at the sheriff's department later, he was told by Officer Reeves that Franks had asked to speak to him. He had Franks delivered to his office where he asked what Franks wanted. Franks said he wanted to tell what had happened. Hicks readvised Franks of his rights, and a statement was taken. The statement essentially repeated what Franks had said earlier.

After Franks was charged with the crime, he was sent to the State Hospital for mental evaluation. He was diagnosed as schizophrenic and determined to be unable to assist in his own defense. Later, after some five months of treatment, a Dr. Brandt of the State Hospital wrote to the Court that Franks was able to assist in his own defense, but "lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law" at the time of the crime.

### 1. Mental capacity

#### a. Motion to acquit

Franks moved for acquittal in accordance with Ark. Code Ann. §5-2-313 (Supp. 1989) which provides:

> On the basis of the report filed pursuant to § 5-2-305, the court may, after a hearing if a hearing is requested, enter judgment of acquittal on the ground of mental disease or defect if it is satisfied that, at the time of the conduct charged, the defendant lacked capacity, as a result of mental disease or defect, to conform his conduct to the

requirements of law or appreciate the criminality of his conduct. . . .

At the hearing on the motion, Dr. Marino, a psychiatrist from the State Hospital, testified that Franks was delusional and mentally ill, and with the exception of the delusions, his illness was in remission. The delusions included, but were not limited to thoughts that Franks was a member of the CIA, the FBI, and a deputy provost marshall. Franks' mother testified about similar delusions Franks had had and that he also had a delusion about his father being someone named "Apocalypse Franks."

In response, the State pointed out that when Hicks asked Franks to come to the Sheriff's office to make a formal statement, Franks wanted to "plead the Fifth" and asked for a lawyer. The State also noted that Franks attempted to eliminate evidence of the crime and thus seemed to appreciate the criminality of his acts.

■ The motion was denied, and we cannot say that was error. The basis of the motion is the statute quoted above which clearly says that the Court *may* acquit on the basis of the motion, but there is no requirement that it do so. Construing a predecessor to the current statute, this Court wrote in *Westbrook* v. *State*, 274 Ark. 309, 624 S.W.2d 433 (1981), that "the statute permits the trial judge to acquit the defendant 'in cases of extreme mental disease or defect where the lack of responsibility on the part of the defendant is clear,' . . ." While there was strong evidence that Franks has been psychotic for years, we cannot say the Trial Court erred in finding that it was not "clear" that Franks was not responsible for his acts at the time the crime was committed.

### b. Directed verdict

At the trial, Dr. Bunten, a State Hospital psychologist, and Dr. Marino testified about Franks psychotic condition, and both opined that Franks was not responsible for his acts at the time of the crime. That evidence was supplemented by testimony of Franks' mother and an aunt, both of whom gave more information about bizarre delusional conduct on his part.

Dr. Bunten and Dr. Marino conceded that their opinions about Franks' condition at the time the crime occurred had to be based on his history, and they could not say with certainty that he

was delusional on that date or that he was suffering any particular delusion having to do with his grandmother.

The State presented the testimony of Dr. Austin, a psychiatrist who had not examined Franks. Dr. Austin responded to a hypothetical question by stating, in effect, that a person who was a severe schizophrenic could have done a killing like the one in question here either in response to a delusion or in response to a longstanding argument. Testimony had been presented indicating that Franks and his grandmother had argued over time about Franks' lack of employment.

Franks cites no authority for the proposition that the Court should have directed a verdict in his favor. In *Campbell* v. *State*, 265 Ark. 77, 576 S.W.2d 938 (1979), Campbell moved for directed verdict on the basis of lack of mental capacity to commit the crime. We noted that the lack of capacity defense is an affirmative defense to be established by the defendant by a preponderance of the evidence, the question being primarily for the jury, and the judge may direct a verdict only when no fact issue exists. See also *McCaslin* v. *State*, 298 Ark. 335, 767 S.W. 2d 306 (1989), in which we affirmed a trial courts' denial of a motion for directed verdict based on the affirmative defense of entrapment because the defendant failed to prove entrapment as a matter of law; *Owens* v. *State*, 300 Ark. 73, 777 S.W.2d 205 (1989), also holding that an affirmative defense is established as a matter of law only if there are no factual issues remaining to be resolved by the trier of fact.

■ While we agree there was very strong evidence that Franks lacked capacity to appreciate the criminality of his acts at the time the crime was committed, we cannot say he had established the defense as a matter of law. If the jury were to find that Franks killed his grandmother and then took fairly elaborate, although not at all successful, steps to hide the crime, that was to be considered on the issue of capacity. So also was Franks' "pleading the Fifth" and his request for a lawyer. Franks' mental capacity was a factual issue, and we cannot hold it was error to allow the jury to decide it.

## 2. The statement

Franks' argument with respect to keeping his statement out of evidence is that Officer Hicks interviewed Franks after he had said he wanted a lawyer, but before he was successful in contacting a lawyer. If Officer Hicks initiated the contact, that would clearly have been prohibited by *Edwards* v. *Arizona*, 451 U.S. 477 (1981). At a pretrial hearing on Franks' motion to suppress the statement, Officer Reeves, the officer who told Hicks that Franks wanted to talk to Hicks after Hicks reached the sheriff's department, testified he could not personally say he heard Franks make such a request. Officer Hicks testified that when Franks was brought to him, he asked Franks if he had called his attorney, and Franks replied that he could not get in touch with him. Hicks then testified that Franks "said at that time he wanted to talk to us."

In *Findley* v. *State*, 300 Ark. 265, 778 S.W.2d 624 (1989), we pointed out that when an accused initiates contact with police authorities after having requested counsel the right to counsel may be considered waived. If Hicks' testimony is to be believed, Franks initiated the contact resulting in his statement, and there was no Sixth Amendment violation. The question is one of credibility. *Segerstrom* v. *State*, 301 Ark. 314, 783 S.W.2d 847 (1990); *Findley* v. *State, supra.* We cannot say the Court erred in denying the motion.

## 3. The dictionary

Without the knowledge of the Court or counsel, the jurors requested that the bailiff bring them a dictionary so they could look up the definition of "premeditation." The bailiff complied with the request. Franks moved for a new trial, and both sides stipulated that the incident occurred as described above. Franks contends it was error to deny his motion for a new trial.

The Trial Court concluded it was error for the jurors to have received the dictionary but, after reading the dictionary definition and the instruction given to the jury on premeditation, held that the error was not prejudicial. The jury was instructed on premeditation as follows:

> In order to find that Vernon Keith Franks acted with a premeditated and deliberated purpose, you must find that

he formed that intention before acting as a result of a weighing in the mind of the consequences of a course of conduct as distinguished from acting on impulse without the exercise of reasoning powers.

The definitions seen by the jury in the dictionary were:

Premeditate . . . to think over, premeditate; . . . to think out, plan or scheme beforehand, vi. to think or meditate beforehand.

Premeditation . . . a premeditating; specifically, in *law* a degree of planning and forethought sufficient to show intent to commit an act.

We do not reverse the refusal to grant a new trial unless we find the trial court abused its discretion. *Mitchell* v. *State*, 299 Ark. 566, 776 S.W.2d 332 (1989); *Langston* v. *Hileman*, 284 Ark. 140, 680 S.W.2d 89 (1984).

We find no abuse of discretion here. An annotation at 35 ALR4th 626, 645, cites many cases in which a jury has somehow obtained a dictionary and looked up words, and it has been held that no prejudice resulted. While we agree that, generally, it is misconduct for a jury to seek out reading material without the knowledge of the court and the parties, prejudice does not occur in every case. We tend to agree with the Trial Court that the dictionary definitions quoted above were clearer than the lawyer words "conscious object" found in the instruction and that nothing in the dictionary definitions was prejudicial to Franks.

Affirmed.