Marc Stephen DAVASHER *v.* STATE of Arkansas

CR 91-5                                  823 S.W.2d 863

Supreme Court of Arkansas
Opinion delivered January 27, 1992

156

*Daniel D. Becker*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. The appellant, Marc Stephen Davasher, was convicted of capital murder of Loretta Hignight and her daughter, Bonnie Hignight Hamilton, and burglary of their home. Devasher raised eight points on appeal, contending the Trial Court erred by (1) not directing a verdict in his favor on the burglary charge because there was insufficient evidence of an unlawful entry, (2) not granting a motion to suppress evidence taken from the front porch of his mother's home, (3) not granting a motion to suppress evidence consisting of blood, saliva, hair, and other substances taken from his body because defense counsel was not notified that these samples would be taken, (4) refusing to grant a mistrial when a serologist referred to "suspected mari-juana seeds" seized from his apartment, (5) allowing a forensic odontologist to testify he could not rule out the conclusion that bite marks located on Davasher's leg were inflicted by the victims' dog, (6) allowing two counselors to testify in violation of the psychotherapist-patient privilege, (7) not granting a motion for acquittal or a directed verdict on the ground of mental disease or defect, and (8) allowing a criminologist to testify that the victims' hairs were found on Davasher's clothes when there was no evidence as to how the witness had received the victims' hairs which were used for comparison.

We affirm the conviction. There was substantial evidence

from which the jury could have concluded Davasher unlawfully entered the Hignight residence. Because the evidence was seized from his mother's home, Devasher has no standing to assert the alleged illegality of the search. We find no prejudice in the failure to notify defense counsel that body substance samples would be taken from Davasher. The admonishment given by the Trial Court to the jury cured any possible prejudice which might have resulted from the testimony regarding the suspected marijuana seeds. We further conclude the scientific testimony regarding dog bite identification was reliable. As to the psychotherapist-patient privilege, Davasher has waived the privilege by raising mental disease or defect as a defense. The Trial Court was not required to enter a judgment of acquittal on the ground of mental disease or defect, and we find substantial evidence to support the jury verdict on this issue. On the final point, we find no abuse of the Trial Court's discretion as the chain of custody and foundation for introduction of the physical evidence in question were sufficient.

On the morning of September 14, 1988, Bonnie Hamilton called the Hot Springs Police Department at approximately 8:30 and told Sergeant Harold Turner her ex-boyfriend was knocking on the front door of the home at 741 Linwood, and he had a knife. Hamilton's mother, Loretta Hignight, made a second call a few minutes later and told Turner her daughter's ex-boyfriend was breaking into their house and wanted to kill someone.

Officer Tim Hoover was the first to arrive at the scene where he found the front door of the house standing open. After searching the rooms, he went to the back door and saw the bodies of Hamilton and Hignight lying side by side in the back yard. He further observed severe cut wounds on the victims' heads and bodies. The family dog, Scooter, was found between the bodies, whimpering.

Marc Davasher lived in an apartment at 135 Watt Street, one block from the Hignight residence. One of Hamilton's friends, Paula Pendarvis testified Hamilton seemed scared and told her Davasher was "really strange." Another friend, Jerry Stouffer, testified he saw Hamilton and Davasher together only one week before the crime.

Around 9:00 a.m. on the 14th, Davasher went to a liquor

store located three blocks away from the Hignight residence and bought a six pack of beer. The owner of the store stated Davasher seemed nervous. Davasher was interviewed briefly by a police officer after leaving the liquor store. He calmly told the officer he had been at the liquor store. He was holding a package of beer over his chest.

Davasher's mother became worried about her son that morning, so she called Chris Bonney, one of his counselors at the Garland County Mental Health Center. Mrs. Davasher told Bonney "Her son was in a bad way," and she asked Bonney to go with her to check on him. Mrs. Davasher and Bonney went to Davasher's apartment on Watt Street. By that time, several police cars had arrived at the Hignight's home on Linwood. Mrs. Davasher and Bonney went into the apartment where Bonney observed severe scratches on Davasher's chest and injuries on his hands.

Bonney then went outside and told Officer Larry Douglas that a patient living nearby, Marc Davasher, appeared very upset and was not taking his medication. Bonney described Davasher's physical condition and told the officer Davasher might have had something to do with the crime. Bonney came back into the apartment and told Davasher the police were coming to each house in the neighborhood to ask questions about a crime committed on Linwood. Mrs. Davasher then said "Let's go," and she picked up some clothes lying on the floor. Mrs. Davasher took her son to her house.

After arriving at her house, Mrs. Davasher called Norma Joyce, another counselor of Davasher at the Mental Health Center. She asked Joyce to come see her son. Joyce was afraid to go to the house alone because she believed Davasher might be violent. By this time, officers had received information that Davasher might have been Hamilton's ex-boyfriend. Officer Douglas and Investigator Birdsong accompanied Joyce to the house, and Mrs. Davasher let them inside to speak to Davasher. One officer stated Davasher looked like he had been crying. The officers observed fresh scratches on Davasher's chest and injuries on his hands. They observed Davasher's fingers were blistered from burns.

Birdsong asked Davasher if he would go to the station and

answer some questions. At first Davasher agreed to go, but he later refused and was placed under arrest. When the officers were leaving the house with Davasher in custody, they seized some wet clothes lying on the front porch. The clothes included basketball shoes, blue jeans, blue shorts, white shorts, a black pullover shirt, and two pairs of underwear. Birdsong testified Mrs. Davasher told him the clothes belonged to her son. There was evidence that Davasher frequently stayed at his mother's house. In the back seat of the police car, Davasher told Officer Larry Selig, "Things didn't turn out the way they were supposed to," and "I read the Bible."

The day after the crime officers searched Davasher's apartment pursuant to a warrant. They seized an envelope with the name "Bonnie" written twice. Lisa Calhoun, a forensic serologist, obtained scrapings from Davasher's patio door which later revealed the presence of blood. A machete was found in bushes near the crime scene. No fingerprints were found on the knife, but it also tested positive for blood. Joyce testified Davasher once told her he owned a machete. Donald Smith, a criminologist with the Arkansas State Crime Laboratory, found evidence of Hignight's hair on Davasher's pullover sweater. He also found evidence of Hamilton's hair on Davasher's blue shorts.

The State filed a motion for blood, hair, saliva, and other body substance samples to be taken from Davasher. Included in the motion was a request for impressions and photographs of wounds located on Davasher's ankles, legs, and hands. The State requested this evidence to prove by scientific testimony that a wound located on Davasher's leg was a bite inflicted by the Hignights' dog, Scooter. Dr. Richard Glass, a forensic odontologist, was allowed to testify that he could not rule Scooter out as the dog that bit Davasher.

Davasher filed a notice to raise mental disease or defect as a defense, and he was sent to the State Hospital for evaluation. On November 9, 1988, Dr. David Pritchard determined that because Davasher suffered from paranoid schizophrenia, he could not cooperate with an attorney in the preparation of his defense and could not understand the nature of the charges against him. On December 1, 1989, Dr. Marino, a psychiatrist at the State Hospital, determined Davasher competent to proceed. Dr. Ma-

rino also found that at the time of the commission of the offenses, Davasher lacked the capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of law. On March 2, 1990, Davasher filed a motion to dismiss and a motion for judgment of acquittal due to mental disease or defect. Davasher also filed a motion to suppress evidence taken from his mother's residence and a motion to suppress evidence taken from his person. The motions were denied.

Davasher introduced medical evidence at trial that because he suffered from paranoid schizophrenia, he could not conform his conduct to the requirements of law or appreciate the criminality of his actions. There was no medical evidence to the contrary. Dr. Marino stated that, at the time of the offenses, Davasher was under the influence of psychotic symptoms. He further stated Davasher was tortured by religious delusions. Dr. Marino could not remember anyone at the State Hospital who disagreed with this conclusion. Dr. Hall, Director of Forensic Services at the State Hospital, testified Davasher suffered from paranoid schizophrenia and could not conform his conduct to the requirements of the law. Dr. Stephens, a clinical psychologist who examined Davasher initially at the State's instance, agreed with this diagnosis. Despite this evidence, the jury found Davasher guilty of capital murder and burglary and imposed a life without parole plus twenty years sentence.

## 1. Evidence of burglary

A person commits burglary, as defined by Ark. Code Ann. § 5-39-201 (1987), "if he enters or remains unlawfully in an occupiable structure of another person with the purpose of committing therein any offense punishable by imprisonment." Davasher contends a directed verdict should have been granted on the burglary charge because there was no showing he entered the house occupied by Hamilton and Hignight.

On appeal from a denial of a directed verdict, we look to see if there is any substantial evidence to support the verdict. *Traylor* v. *State*, 304 Ark. 174, 801 S.W.2d 267 (1990). Substantial evidence has been defined as being of sufficient force and character to compel a conclusion one way or the other, forcing the mind to pass beyond suspicion or conjecture. *Holloway* v. *State*, 293 Ark. 438, 738 S.W.2d 796 (1987).

Circumstantial evidence may constitute substantial evidence. *Summers* v. *State*, 300 Ark. 525, 780 S.W.2d 541 (1989); *Still* v. *State*, 294 Ark. 117, 740 S.W.2d 926 (1987). For circumstantial evidence to be sufficient to support a finding of guilt in a criminal case, it must exclude every other reasonable hypothesis consistent with innocence. Whether the evidence excludes every other reasonable hypothesis is for the finder of fact to determine. *Summers* v. *State, supra; Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988).

■ The circumstantial evidence of an unlawful entry was sufficient in this case. Hamilton told the police that an ex-boyfriend was knocking on her front door and had a knife. Officer Hoover testified the front door was standing open when he arrived. It is reasonable to assume that the calls to the police were made from inside the house. Because the victims' bodies were later found outside the rear of the house, the jury could have reasonably inferred Davasher forcibly entered the front door and chased the victims outside.

## 2. Standing

As the officers were removing Davasher from his mother's home, they saw some clothing on the porch which was "soaking wet." Mrs. Davasher identified the clothes as belonging to her son. The clothing was seized, and from it the evidence described above connecting Davasher to the crime was obtained. Davasher contends his rights were violated because the officers had neither a warrant nor permission to search the premises.

Evidence should be excluded when the Court finds that an unlawful search or seizure violated the defendant's constitutional rights. The defendant's rights are violated if the challenged conduct invaded his legitimate expectation of privacy. *State* v. *Villines*, 304 Ark. 128, 801 S.W.2d 29 (1990). A person's Fourth Amendment rights are not violated, however, by the introduction of damaging evidence secured by the search of a third person's premises or property. *Fernandez* v. *State*, 303 Ark. 230, 795 S.W.2d 52 (1990), citing *Rakas* v. *Illinois*, 439 U.S. 128 (1978).

■ In *Parette* v. *State*, 301 Ark. 607, 786 S.W.2d 817 (1990), this Court held an individual had no standing to contest a warrantless search and seizure because there was no showing that

the person owned or leased the searched premises. Furthermore, there was no showing the person maintained any control over the premises.

The mere fact that Davasher frequently stayed at his mother's home does not give him a reasonable expectation of privacy in the premises. Davasher did not show that he owned, leased, or maintained control over the house. The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights have been violated by the challenged search or seizure, *State* v. *Hamzy*, 288 Ark. 561, 709 S.W.2d 397 (1986), and that has not occurred in this case.

### 3. *Failure to give notice*

Davasher argues the blood, saliva, hair, and other body substances taken from him shortly after his arrest should not have been admitted into evidence because they were taken without notice to his counsel. Davasher also contends the Trial Court's order allowing samples to be taken did not specifically refer to photographs and castings which were taken of the alleged dog bite on his leg, thus these specific items of evidence should have been suppressed.

Arkansas Rule of Criminal Procedure 18.1(b) (1991) states in part, "whenever the personal appearance of the defendant is required to take samples of his blood, hair, and other materials of his body, reasonable notice of the time and place of the appearance shall be given to the defendant and his counsel." Defense counsel stated he had not been notified. The prosecutor's predecessor who was in office when Davasher was arrested could not recall whether notice to counsel had been given.

The issue is whether suppression of the evidence is an appropriate remedy for a violation of Rule 18.1(b). The standard of review on imposing sanctions for discovery violations is whether there has been an abuse of discretion. *Lear* v. *State*, 278 Ark. 70, 643 S.W.2d 550 (1982).

At the suppression hearing, defense counsel argued that the failure to notify him of the taking of samples was "prosecutorial misconduct" for which the remedy was suppression of the evidence. He stated that spontaneous statements made by Davasher during the taking of the evidence would not have been

made if he had been present to advise his client.

The Trial Court suppressed the statements made by Davasher at the time the physical evidence was taken but refused to suppress the physical evidence because he found no prejudice resulting from the failure to notify defense counsel.

■ When there has been a failure to comply with discovery procedures, a trial court is not required to suppress evidence unless prejudice will result. *Hall* v. *State*, 306 Ark. 329, 811 S.W.2d 318 (1991). At the general suppression hearing during which a number of motions to suppress were considered with respect to various items of evidence, defense counsel did not suggest how prejudice might have occurred from his not being present when the samples were taken from Davasher. In reviewing the transcript, however, we recognized that defense counsel, at a mid-trial suppression hearing with respect to dog bite evidence, asserted he would have been in a better position to cross-examine the State's expert witness if he had been present when the physical evidence was taken. Defense counsel's statement was made in the context of objecting to not being provided access to slides depicting the casts taken of Scooter's dentition and the area of Davasher's leg which allegedly suffered the bite.

■ To solve the problem, the Trial Court agreed to provide defense counsel funds for an expert witness to testify on Davasher's behalf regarding the dog bite evidence. At the conclusion of the colloquy between the Court and defense counsel, defense counsel was asked if his objection was satisfied, and he agreed that it was. Defense counsel cross-examined the State's expert with respect to the dog bite evidence. Later in the trial, defense counsel announced he would not present a rebuttal expert after all because his cross-examination of the State's expert was sufficient. In these circumstances, we cannot conclude that prejudice resulted from the failure to notify counsel of the taking of the samples, especially in view of the apparent waiver of the objection.

■ The Trial Court recognized that the order allowing samples to be taken did not specifically refer to taking photographs and castings of Davasher's leg. The order, however, did refer to the motion which requested these things. Arkansas Rule of Criminal Procedure 18.1(a) requires a judicial officer to order

a defendant to submit to taking samples. We find no error in the Trial Court's conclusion that the evidence which was the subject of the order could have easily been determined by referring to the motion.

### 4. Mistrial

Lisa Calhoun, a serologist called by the State to testify about body fluids she had found and identified at Davasher's apartment and on the machete found in the vicinity of the crime, revealed in a pre-trial hearing that she located "suspected marijuana seeds" in Davasher's apartment. The State agreed not to introduce this evidence at trial. An opening question by the prosecution to Ms. Calhoun was:

> Q: First of all, I would like for you to take it one step at a time. If you would, please, ma'am, tell me what you collected [from Davasher's apartment] and how you did it on each individual item.

To which she responded:

> A: The first thing that I collected were suspected marijuana seed —

Defense counsel objected at that point and moved for a mistrial. The Trial Court denied the motion and admonished the jury to disregard the statement.

In *Free* v. *State*, 293 Ark. 65, 732 S.W.2d 452 (1987), we wrote:

> Declaring a mistrial is an exceptional remedy to be used only where any possible prejudice cannot be removed by an admonition to the jury. *Cobb* v. *State*, 265 Ark. 527, 579 S.W.2d 612 (1979). The trial court is granted a wide latitude of discretion in granting or denying a motion for mistrial, and the decision of the trial court will not be reversed except for an abuse of that discretion or manifest prejudice to the complaining party. *Brown* v. *State*, 259 Ark. 464, 534 S.W.2d 207 (1976).

Had the question in this case been solely whether Davasher was the person who performed the killing, we could easily reject the argument that a mistrial should have been granted. The

question is closer, however, in view of the fact that Davasher pleaded not only not guilty, but not guilty by reason of insanity. We recognize that the introduction of evidence of illicit drug use might have affected the jury's decision with respect to the insanity defense.

A review of our cases where similar incidents have occurred, and a trial court has refused to grant a mistrial, shows a balancing approach. *See, e.g., Maxwell* v. *State,* 279 Ark. 423, 652 S.W.2d 31 (1983); *Wheat* v. *State,* 295 Ark. 178, 747 S.W.2d 112 (1988). As indicated in the *Free* case, a trial court must balance the curative effect of the admonition given to the jury against the prejudice which might have resulted from the improper testimony. On appeal, we must decide whether a trial court abused its discretion in this weighing process or whether there has been a showing of "manifest prejudice" resulting from the objectionable evidence coming before the jury.

In this case, as will be discussed below, Davasher put on a very strong case of mental illness, and the jury heard no further testimony about any possibility of his mental condition having been drug induced. While we cannot know with certainty the effect of the admonishment given to the jury to disregard the statement about marijuana seeds being found in Davasher's apartment, we cannot conclude there was "manifest prejudice" and abuse of discretion in failure to grant a mistrial.

### 5. *Admissibility of dog bite evidence*

Dr. Glass, the State's expert witness with respect to the evidence that Scooter bit Davasher, specialized in forensic odontology. A forensic odontologist identifies bodies by dental examination and also identifies bite marks. Dr. Glass is a licensed dentist and is board certified by the American Academy of Oral Pathology. At the time of trial, he had been qualified to testify about human bite mark identification six or seven times. He had testified concerning dog bite identification twice.

Dr. Glass obtained a cast impression of Scooter's mouth and of the bite marks on Davasher's leg. He believed the injury marks on Davasher's leg were caused by a bite based on the arc shape of the wound. After comparing the two impressions and, according to his testimony, attempting in every possible way to exclude

Scooter as having caused the bite mark, Dr. Glass testified he could not rule Scooter out as the dog that bit Davasher.

Davasher argues the scientific methodology used by Dr. Glass had not achieved general acceptance within the scientific community, was not helpful to the trier of fact, and was prejudicial. The State responds, citing our recent holding in *Prater v. State*, 307 Ark. 180, 820 S.W.2d 429 (1991).

In the *Prater* case, we announced the standard for determining the admissibility of novel scientific evidence, specifically DNA identification evidence. A relevancy approach was adopted which focuses on (1) the reliability of the novel process used to generate the evidence, (2) the possibility that admitting the evidence would overwhelm, confuse, or mislead the jury, and (3) the connection between the novel process evidence to be offered and the disputed factual issues in the particular case. Reliability is the critical element.

There is a big difference between DNA identification and dog bite identification. A glance at the discussion of the evidence evaluated in the *Prater* case reveals that testimony relating to DNA has more potential for confusing the jury than testimony relating to dog bites. With the exception of the identification of the blood and microbes, which were not particularly significant here, the jury could see for itself the photographs and the casts of the wound located on Davasher's leg and the photographs and casts of the dog's dentition and draw conclusions without complicated scientific explanation.

Applying the *Prater* rationale, we cannot agree that the procedures used by Dr. Glass were unreliable. Dr. Glass testified the same basic procedures are used for analyzing dog bites and human bites. Human bite mark identification evidence is widely accepted by courts. *See, e.g., People v. Marx*, 54 Cal. App. 3d 100, 126 Cal. Rptr. 350 (1975); *People v. Milone*, 43 Ill. App. 3d 385, 356 N.E.2d 1350 (1976); *People v. Middleton*, 54 N.Y.2d 42, 429 N.E.2d 100, 444 N.Y.S.2d 581 (1981); P. Gianelli & E. Imwinkelried, *Scientific Evidence*, § 13-4 (1986).

There is little danger that bite mark identification testimony will confuse, overwhelm, or mislead the jury. The methodology is relatively simple. There is a clear connection

between the evidence in this case and the disputed factual issue. The disputed issue was whether Davasher had been bitten by the dog in question. The evidence was helpful in determining it could have occurred. The fact that Dr. Glass could not positively state that Scooter bit Davasher goes only to the weight of the evidence, not its admissibility.

## 6. A.R.E. 503

Davasher contends the Trial Court erred by allowing Bonney and Joyce to testify in violation of the psychotherapist-patient privilege. Arkansas Rule of Evidence 503(b) (1991) provides in part that "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of his physical, mental, or emotional condition." Section (a)(4) defines confidential communication as "not intended to be disclosed to a third party." Section (d)(3) provides in part "[t]here is no privilege under this rule as to a communication relevant to an issue of the physical, mental, or emotional condition of the patient in any proceeding in which he relies upon the condition as an element of his claim or defense."

Bonney testified about what he observed upon entering Davasher's apartment. He disclosed no confidential communications made by Davasher. The real aim of the physician-patient privilege and presumably the same applies to the psychotherapist, is to prevent a doctor from repeating what a patient told him in confidence. *Oxford* v. *Hamilton*, 297 Ark. 512, 763 S.W.2d 83 (1989); *Baker* v. *State*, 276 Ark. 193, 637 S.W.2d 522 (1982).

Joyce testified that when Davasher was one of her patients he told her he owned a machete. Joyce testified the conversation was not part of Davasher's diagnosis or treatment. If the statement was not made for the purpose of diagnosis or treatment, it was not privileged. If it was made for either of those purposes, it was privileged, but the privilege was waived by claiming mental disease or defect as a defense.

## 7. Mental disease or defect

Davasher next argues the Trial Court should have granted his motion to acquit on the basis of mental disease or defect. He also asserts the Trial Court should have granted a directed verdict on the issue of mental disease or defect because he introduced uncontroverted medical evidence that he was a paranoid schizophrenic.

### a. Motion to acquit

Although the medical testimony regarding Davasher's mental illness was not rebutted by other medical testimony, there was no requirement that the Trial Court enter a judgment of acquittal. Arkansas Code Ann. § 5-2-313 (1987) provides a court "may" enter a judgment of acquittal on the grounds of mental disease or defect. "[T]he statute permits the trial judge to acquit the defendant in cases of extreme mental disease or defect where the lack of responsibility on the part of the defendant is clear." *Franks* v. *State*, 306 Ark. 75, 811 S.W.2d 301 (1991); *Westbrook* v. *State*, 274 Ark. 309, 624 S.W.2d 433 (1981). Denial of the motion was clearly within the Trial Court's authority and discretion.

### b. Directed verdict

Mental disease or defect is an affirmative defense which must be proven by a preponderance of the evidence. Ark. Code Ann. § 5-2-312 (1987); *Campbell* v. *State*, 265 Ark. 77, 576 S.W.2d 938 (1979). The question on appeal from a denial of a directed verdict is whether there is substantial evidence to support the verdict. *Couch* v. *State*, 274 Ark. 29, 621 S.W.2d 694 (1981). In support of the verdict, the State argues there was evidence that Davasher bought a machete six months before the crime, that he attempted to wash his clothes after the crime to remove incriminating evidence, and that he burned his hands so the police would have trouble obtaining his fingerprints. These steps taken to avoid identification as the culprit indicate Davasher was cognizant of his wrongdoing at the time the crime was committed. Davasher responds by summarizing the medical evidence, which was unrefuted by other medical evidence, that he was not legally responsible for his actions at the time of the offenses.

█ We recognize that the medical evidence on the issue of insanity was highly persuasive. It has consistently been held, however, that a jury is not bound to accept opinion testimony of experts as conclusive, and it is not compelled to believe their testimony any more than the testimony of other witnesses. Even when several competent experts concur in their opinions, and no opposing expert evidence is offered, the jury is bound to decide the issue upon its own judgment. Testimony by expert witnesses is to be considered by the jury in the same manner as other testimony and in light of other testimony and circumstances in the case. The jury alone determines what weight to give the evidence, and may reject it or accept all or any part of it they believe to be true. *Robertson* v. *State*, 304 Ark. 332, 802 S.W.2d 448 (1991); *Gruzen* v. *State*, 267 Ark. 380, 591 S.W.2d 342 (1979).

## 8.   Foundation evidence

Donald Smith, a criminologist with the State Crime Laboratory, testified that he identified hairs found on Davasher's clothing as coming from the victims. Davasher argues there was no basis for Smith's assertion that the hair samples he received from the medical examiner for comparison were actually the victims' hairs.

█ Smith testified he compared samples taken from Hignight with hair found on Davasher's sweater and found a match. Thereafter, he stated he compared samples taken from Hamilton with hair found on Davasher's shorts and found a match. Although an objection was raised to the later testimony about Hamilton's hairs being found on items belonging to Davasher, no objection was made when Smith first testified that the hairs from Davasher's sweater were Hignight's. To preserve a point for review, a proper objection must be asserted at the first opportunity after the objectionable matter occurs. *Asher* v. *State*, 303 Ark. 202, 795 S.W.2d 350 (1990); *Boone* v. *State*, 282 Ark. 274, 668 S.W.2d 17 (1984). The objection was waived with respect to Hignight's hair samples; the question remains with respect to those of Hamilton.

Smith testified he received the Hamilton hair samples from the medical examiner. The medical examiner testified he took hair samples from Hamilton's body. Although the issue is framed as whether there was a proper foundation for Smith's testimony,

it is essentially a chain of custody argument. The ultimate argument made by defense counsel at trial was that the medical examiner, not Smith, took the hairs from the victim; therefore, Smith's basis for assuming that the hairs he used for comparison purposes were taken from the victims was the hearsay statement of the medical examiner.

██ The purpose of establishing a chain of custody is to prevent the introduction of evidence which is not authentic. Minor discrepancies in the chain of custody are for the Trial Court to weigh. *Neal* v. *State*, 298 Ark. 565, 769 S.W.2d 414 (1989). In *Phills* v. *State*, 301 Ark. 265, 783 S.W.2d 348 (1990), we could not tell precisely the nature of the appellant's objection to a serologist's testimony regarding blood samples. We surmised the objection had to do with the adequacy of the foundation laid for the testimony. We wrote:

> Appellant may be arguing that [the] foundation [which was laid] was inadequate. As in *Munnerlyn* v. *State*, 264 Ark. 928, 576 S.W.2d 714 (1979), appellant does not allege that the samples had been tampered with and there is nothing in the record to suggest such a possibility. It is not necessary that every moment from the time evidence comes into the possession of a law enforcement agency until it is introduced at trial be accounted for by every person who could have conceivably come into contact with it. It is only necessary that the trial judge, in his discretion, be satisfied that the evidence presented is genuine and, in reasonable probability, has not been tampered with. The trial judge did not abuse his discretion in allowing the result of the serological test of appellant's blood sample.

██ We find the showing of the chain of custody was sufficient, and thus we agree with the State's position that a sufficient foundation had been laid for the introduction of the hair samples taken from the victims.

### 9.  *Rule 11(f)*

In accordance with Supreme Court Rule 11(f), the record has been reviewed for all errors prejudicial to the defendant, and none have been found.

Affirmed.

Brown, J., dissents.

Robert L. Brown, Justice, dissenting. I dissent. Over the years the insanity defense has been whittled away until, with this case, virtually nothing is left.

Our state statutes set out an elaborate scheme for determining mental disease at the time of the offense. *See* Ark. Code Ann. § 5-2-393, et seq. (1987) and (Supp. 1991). The salient points of the procedure are these:

a. Evidence of a mental disease is admissible to prove whether the defendant had the culpable mental state to commit the offense. § 5-2-304.

b. Once the defendant files notice of a mental-disease defense, the trial court orders a psychiatric examination. §§ 5-2-304, 5-2-305 (Supp. 1991).

c. The report of the examiner includes whether the defendant had the ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law at the time of the offense. § 5-2-305 (Supp. 1991).

d. Lack of capacity due to mental disease is an affirmative defense. § 5-2-312 (1987).

e. Lack of capacity due to mental disease at the time of the offense may result in a judgment of acquittal by the court. § 5-2-313 (1987).

f. Commitment of the defendant to the state hospital, upon a judgment of acquittal, may be commenced by the circuit court with resolution resting in the probate court. § 5-2-314 (Supp. 1991).

g. Release or discharge after commitment lies with the probate court after notice to the prosecuting attorney and defendant. § 5-2-315 (Supp. 1991).

This case represents the first time that this court has upheld an appellant's mental·capacity in the face of all expert or lay testimony to the contrary. In *Franks* v. *State*, 306 Ark. 75, 811 S.W.2d 301 (1991) the state presented the testimony of a

psychiatrist who answered, hypothetically, that a person suffering from severe schizophrenia like the accused could have killed either because of delusion or longstanding argument. In *Robertson* v. *State*, 304 Ark. 332, 802 S.W.2d 920 (1991), Dr. Marino, staff psychiatrist for the state hospital, testified that the defendant was neither schizophrenic nor psychotic at the time of the killing. Similarly, in three other cases where mental disease and capacity to commit the crime were at issue, state hospital personnel found the defendants to be "without psychosis." *Couch* v. *State*, 274 Ark. 29, 621 S.W.2d 694 (1981); *Westbrook* v. *State*, 274 Ark. 309, 624 S.W.2d 433 (1981); *Avery* v. *State*, 271 Ark. 584, 609 S.W.2d 52 (1980).

The appellant hacked to death two women with a machete. He did this in the women's back yard in broad daylight. He had first harassed the women by beating on their front door, giving them time to call the Hot Springs police twice. After the killings he had rushed wildly away and cut his stomach severely when he apparently dove over a barbed wire fence. At some point, either before or after the killings, he burned all ten fingers on a hot pan or hot stove. He changed clothes, and the clothes he had been wearing were piled by his mother on her front porch. They were wet. Thirty minutes after the savage killings, the appellant bought a six pack of beer and seemed only a "little nervous" to the salesman. These facts are byzantine on their face.

Exacerbating the abnormality of these events were the circumstances of his arrest within two to three hours of the deaths. He told Sergeant Larry Selig of the Garland County Sheriff's office: "I read the Bible. Anyone that conquers the Bible can conquer the world." When Hot Springs police officer Larry Douglas walked into the house where the appellant's mother lived, he found him sitting in a chair drinking a beer with his shirt open. The gouges on his chest were in plain view.

The defense notified the prosecuting attorney that it would present a mental disease defense. On September 27, 1988, the appellant was admitted to the state hospital for evaluation.[1] He

---

[1] The appellant had been a patient before at the state hospital in August 1986 for amphetamine-induced delirium and was currently in treatment in Hot Springs at a mental health center and on prescribed medication.

was diagnosed as suffering from paranoid schizophrenia, which was not drug related, and remained in the state hospital for the next fifteen months because he was not fit to stand trial. On December 1, 1989, the staff psychiatrist advised the court that he could be tried.

State hospital psychiatrists and staff were all in agreement according to Dr. John C. Marino and Dr. Wendell Hall, two staff psychiatrists, that the appellant was not responsible for his actions the day of the slayings due to mental disease and specifically due to paranoid schizophrenia. Dr. Marino was particularly graphic in his testimony. The appellant hallucinated, heard voices from God, and suffered from delusions. His preoccupation with fanatical religion was flagrant. He was obsessed by the religious concept of the rapture and was convinced that before the rapture there must be human sacrifice. Dr. Marino testified that the appellant was put on heavy dosages of anti-psychotic medicine.

The state hospital's discharge summary filed by Dr. Marino on the appellant reads, in part, thus: "He was delusional about Christ, executions, sacrifices, preachings, and being 'tormented' by the devil and his own religious beliefs." At the time of discharge for trial, he was still complaining of auditory hallucinations "helping me out and not persecuting or commanding in nature."

Both Dr. Marino and Dr. Hall disputed any suggestion that the appellant might be faking his condition because he was a patient at the state hospital for more than fourteen months and was observed round-the-clock by clinicians.

The prosecutor presented no expert opinion to offset the defense witnesses. Nor did the state present lay testimony of competency, though this would have been clearly admissible. *See Moore* v. *Duckworth*, 443 U.S. 713, (1979); *Avery* v. *State, supra.*

We have held that insanity is an affirmative defense to be proven by a preponderance of the evidence. *Robertson* v. *State*, 304 Ark. 332, 802 S.W.2d 920 (1991); *Couch* v. *State*, 274 Ark. 29, 621 S.W.2d 694 (1981). We have further held that the jury is free not to accept the testimony of expert witnesses as conclusive

or to give expert testimony more weight than *other testimony Robertson* v. *State, supra*. Finally, when a jury rejects an insanity defense, the verdict must be supported by substantial evidence to support the jury's finding that the defendant was legally responsible for his acts when the crime was committed. *Gruzen* v. *State,* 267 Ark. 380, 591 S.W.2d 342 (1979).

What the majority relies on as substantial evidence to support the jury's verdict is flimsy indeed. The majority cites a machete purchased six months before the slayings as evidence. Yet the purchase was clearly so stale in time as not to be meaningful. The majority then looks to the appellant's burned fingers and wet clothes as acts of concealment suggestive of furtive activity and, therefore, mental competency. That the fingers were burned is certainly not the act of a sane man. And the record is devoid of proof as to when this was done. The piling of wet clothes on Mrs. Davasher's front porch in full view of law enforcement is exactly the opposite of a clandestine act. Moreover, it could well have been the mother who washed the clothes. When subjected to scrutiny, these circumstances amount to little more than a handful of fog and certainly do not constitute substantial evidence.

The end result of our failure to enforce the insanity defense is that we are incarcerating the criminally insane in our penitentiary system which is not equipped to handle such inmates. Prison personnel, under these circumstances, have no alternative but to place these inmates in maximum security and heavily medicate them. Public policy is not well served by this solution, and the General Assembly did not intend it. Until the General Assembly removes mental disease as a defense to criminal activity and repeals Ark. Code Ann. § 5-2-301, et seq. (1987), we should enforce it.

There was no substantial evidence to go to the jury to support the jury's finding of lack of mental disease. The circuit court erred in refusing to direct a verdict in favor of the appellant on mental disease. I would reverse with instructions to the circuit court to commence commitment proceedings under Ark. Code Ann. § 5-2-314 (Supp. 1991).