Michael Todd DAVIS  *v.*  STATE of Arkansas

CR 06-669                                              246 S.W.3d 862

Supreme Court of Arkansas
Opinion delivered January 11, 2007

*James Law Firm*, by: *William O. "Bill" James, Jr.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Beth B. Carson*, Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Appellant Michael Todd Davis appeals his convictions for the first-degree murder of his wife Jennifer Davis and the kidnapping of his step-daughter Leslie Stewart. He was sentenced to life imprisonment for the first-degree murder conviction and to a forty-year sentence for the kidnapping conviction. On appeal, Davis raises four points of error: (1) the circuit court erred in denying his directed-verdict motion on both charges; (2) the circuit court erred in denying his motion to sever the charges; (3) the circuit court erred in admitting photographs of the murder victim's body and a recording of the 911 call made by Leslie Stewart; and (4) the circuit court erred in refusing to instruct the jury on the lesser-included offense of manslaughter. We affirm on all points.

Davis and Jennifer were married in 2000 and moved to a house near Mountainburg, Arkansas. Davis had two children from a previous marriage, Brittany and Brandon, who lived with the couple. Jennifer had three children from a previous marriage, Leslie, Whittney, and Cassie, who lived with their father in Texas. In late 2004, Leslie and her fiancé Joshua Jordan came to live with the couple in Mountainburg.

Both of Davis's children were teenagers who had been diagnosed with ADHD, and their behavioral problems had caused

conflict in the couple's marriage. During the week before the crimes, Brandon lost three of his coats at school. Distressed by Brandon's recent conduct, Jennifer voiced her concerns to Davis. An argument ensued, and Jennifer apparently gave Davis an ultimatum.

The day of the crimes, March 12, 2004, was a relatively ordinary day for the family. Brandon and Brittany were visiting their mother for the weekend. Davis and Jennifer worked on a fence they were building around the property, and when Leslie arrived home from work, she and Jennifer went shopping. Later that evening, the family ate dinner and watched a movie. Joshua left the house at approximately 9:00 p.m. to work the night shift at a store in Fort Smith. After they were done watching the movie, Jennifer and Leslie were sitting on the couch, and Davis stated that he was going to take a shower and go to bed.

A few minutes later, Davis fired three shots at Jennifer from a .45-70 caliber hunting rifle. Jennifer, who was still sitting on the couch, slumped forward onto the coffee table. Frightened by the shots, Leslie ran down toward a door that led to the garage; but, she was tackled by Davis, who tied her feet together and her hands behind her back with plastic zip-ties and carried her into a bathroom. Davis proceeded to pull all of the phone lines out of the walls and hid the phones in various places around the home.

Upon returning to the bathroom, Davis placed two socks in Leslie's mouth and a ski mask over her head and then took her to his bedroom where he tied her arm to a bedpost. Later, he freed Leslie's arm and cut off her clothes, leaving her lying there exposed for some time. At one point, Davis took Leslie into her bedroom, asked her where she kept her condoms, and proceeded to rape her. When Leslie asked him why he had raped her, he replied that he was "in enough trouble as it was, [and] that one more thing wouldn't hurt." Davis then allowed her to dress and took her back to his bedroom.

Next, Davis began to talk to Leslie about his relationships with his ex-wife, his children, and Jennifer. He wrote remorseful letters to his family members and read the letters to Leslie as he wrote them. Afterward, Leslie heard Davis change clothes, groom himself, and pack a bag. Davis told Leslie that he was going to leave and go kill himself. He also told her that he had hidden a cellular phone and a pair of scissors in the room so that she could free herself after he was gone. Davis then asked her if he could give her

a hug, and out of fear, she consented. As Davis was leaving the residence, Leslie heard him stop by Jennifer's body and tell Jennifer he loved her. The shooting occurred at approximately 10:30 p.m., but Davis did not leave the house until approximately 3:00 a.m. the next morning.

Leslie was able to remove the mask, but, even after finding the scissors, she could not free her hands because the bindings were so tight. Leslie called 911 and told the operator that her mother had been shot, that Davis was the shooter, and that she was bound and could not escape. Officers from the Crawford County Sheriff's Department arrived twenty minutes later.

By the late morning hours of March 13, the sheriff's department still had not located Davis. That morning, one of Davis's friends, Billy Ray Williams, heard about the events of the previous night and contacted Davis on Davis's cellular phone. The two men agreed to meet near Ozark. When Williams arrived, Davis was shaking and talking to himself, saying that he was "a better man than this." Davis told Williams about the events leading up to the murder but would not speak directly about the murder. Davis stated that, looking back on the shooting, it was as though he had stepped out of his body and was watching someone else shoot his wife. Williams urged him to turn himself in to the authorities, which he did.

Ultimately, Davis was charged in the Crawford County Circuit Court with first-degree murder and kidnapping. At trial, he asserted the defense of insanity; but, after the jurors heard the testimony of expert witnesses on both sides, they rejected the insanity defense and returned a verdict of guilty on both counts. Davis was sentenced to life imprisonment for the murder and forty (40) years for the kidnapping. Thus, this court's jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(2) (2006).

## I. Sufficiency of the Evidence

For his first point on appeal, Davis argues that the circuit court erred when it denied his motions for directed verdict on both the first-degree murder charge and the kidnapping charge. On appeal, a motion for directed verdict is treated as a challenge to the sufficiency of the evidence. *Baughman v. State*, 353 Ark. 1, 110 S.W.3d 740 (2003). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Substantial evidence is forceful

enough to compel the fact-finder to make a conclusion one way or the other beyond suspicion or conjecture. *Id.* When determining the sufficiency of the evidence, we view the evidence in the light most favorable to the State, and we will only consider the evidence that supports the verdict. *Id.*

## A. First-Degree Murder

Davis asserts that the circuit court erred in denying his directed-verdict motion on the murder charge because he was insane at the time of the offense and therefore the State did not present sufficient evidence to prove the mens rea element of first-degree murder. A person commits first-degree murder when that person acts "[w]ith a purpose of causing the death of another person, [and] the person causes the death of another person." Ark. Code Ann. § 5-10-102(a)(2) (Repl. 2006). A person acts purposely "when it is the person's conscious object to engage in conduct of that nature or to cause the result." Ark. Code Ann. § 5-2-202(1) (Repl. 2006).

A defendant bears the burden of proving his affirmative defense of insanity by a preponderance of the evidence. *Morgan v. State*, 333 Ark. 294, 971 S.W.2d 219 (1998). The jury is the sole arbiter of whether or not a defendant has sustained his burden of proving the insanity defense by a preponderance of the evidence. *Id.* (quoting *Davasher v. State*, 308 Ark. 154, 169 S.W.2d 863 (1992)). Accordingly, the circuit court may only enter a directed verdict on the affirmative defense of insanity if there are no factual issues remaining to be resolved by the trier of fact. *See Franks v. State*, 306 Ark. 75, 811 S.W.2d 301 (1991). Upon review, we will not reverse a jury verdict rejecting the insanity defense if there is substantial evidence to support the verdict. *Morgan v. State, supra.*

At trial, the defense called psychiatrist Dr. Patricia Walz to testify as an expert witness. Based upon her examination of the defendant, Dr. Walz testified that at the time of the shooting Davis experienced a dissociative episode in which a person becomes unaware of perception, reality, and memory. According to Dr. Walz, in order to be diagnosed with dissociative disorder a person must experience an intensely traumatic and stressful event that triggers an episode. For Davis that traumatic event was his most recent argument with Jennifer. Although Dr. Walz admitted that Davis's experience did not fit into any of the four major categories of dissociative disorder (fugue, multiple personality disorder, amnesia, and depersonalization), she thought his case fell into the

"not otherwise specified" category. Dr. Walz concluded that the dissociative episode was a mental defect that affected Davis's mental abilities at the time of the shooting.

On rebuttal, Dr. Paul Deyoub testified as an expert witness on behalf of the State. Dr. Deyoub concluded that Davis had marital problems and was resentful of Jennifer. He even agreed with Dr. Walz that there was a definite "disconnect" when Davis discussed the shooting. However, Dr. Deyoub determined that Davis did not have a mental disease or defect at the time of the shooting. He testified that even if Davis did have some dissociative feelings, those feelings did not equate to a lack of culpability because it is common for people to feel some dissociation when they experience a very traumatic event. Rather, Dr. Deyoub concluded that Davis was simply rationalizing or minimizing his behavior as a natural defense mechanism.

Although medical evidence and expert testimony can be highly persuasive, the jury is not bound to accept the opinion testimony of any witness as true or conclusive, including the opinion testimony of experts. *Burns v. State*, 323 Ark. 206, 913 S.W.2d 789 (1996). As the sole judge of the credibility of expert witnesses, the jury has the duty to resolve conflicting testimony regarding mental competence. *Id.* Here the jury heard expert-witness testimony that was completely contradictory and was entitled to believe the State's expert over that of the defense. Thus, we conclude that there was sufficient evidence for the jury to determine that Davis did have the requisite mens rea for first-degree murder at the time he shot and killed Jennifer.

## B. Kidnapping

Davis also argues that the circuit court erred when it denied his motion for directed verdict on the kidnapping charge. To commit kidnapping, a person must "without consent . . . restrain another person so as to interfere substantially with the other person's liberty with the purpose of: . . . (3) Facilitating the commission of a felony or flight after a felony." Ark. Code Ann. § 5-11-102(a) (Repl. 2006). Kidnaping is a Class Y felony, but the charge can be lowered to a Class B kidnapping felony if the "defendant shows by a preponderance of the evidence that he . . . voluntarily released the person restrained alive and in a safe place prior to trial." Ark. Code Ann. § 5-11-102(b). Davis does not deny that he committed a kidnapping when he restrained Leslie

and left her bound so that he could flee the scene. Instead, he contends that he left Leslie in a safe place (her home) with the means to escape (scissors and a cellular phone), and therefore the circuit court erred when it refused to lower the charge from a Class Y to a Class B felony.

A case that bears much similarity to the case at hand, *Clark v. State*, 292 Ark. 69, 727 S.W.2d 876 (1984), is instructive here. The defendant in *Clark* kidnapped a family and later left the wife and children handcuffed to a pillar in their garage and the father handcuffed to a banister in his place of work. *Id.* Although the family was technically left in safe places — their home and work — we held that they were not "released," as contemplated by Ark. Code Ann. § 5-11-102(b), because they were left handcuffed to immovable structures, dependent upon being discovered by others.

█ In the instant case, Davis left Leslie with a mask over her face, a gag in her mouth, her feet bound together, and her hands bound behind her back. She was left in a house that was in a rural area, and no one was expected home for several hours. While Leslie was lucky to find the cellular phone and scissors, she was unable to physically release herself from her restraints. In fact, by the time law-enforcement officers arrived, Leslie had begun losing the feeling in her limbs. Based upon this evidence, we cannot say that the circuit court erred in refusing to lower the charge from a Class Y to a Class B felony.

█ Davis attempts to distinguish *Clark* on the theory that our court's opinion in that case turned on the fact that the defendant bound his victims to immovable objects. Because Leslie was simply bound and not tied to an immovable object, Davis argues that the *Clark* case is inapposite. Davis's reasoning is flawed. Although being tied to an immovable object is certainly sufficient to negate a defendant's attempt at a safe release, it certainly is not a prerequisite for this court to find that a kidnapped victim was not released under Ark. Code Ann. § 5-11-102(b). Here, as in *Clark*, Leslie was left to be rescued by others. In other words, she was not released by her kidnaper. Accordingly, we must affirm.

## II. Severance

For his second point on appeal, Davis claims that the circuit court erred in denying his motion to sever the first-degree-murder and kidnapping charges. Specifically, he asserts that the circuit

court should have severed the two offenses so that he could testify about his state of mind related to the shooting of his wife and thereby establish his defense of mental disease or defect. He argues that, pursuant to Ark. R. Crim. P. 22.2(b) (2006), a severance of the charges was essential to a fair determination of his guilt or innocence.

A review of the record reveals that Davis based his motion for severance on the proposition that he wanted to testify about the murder but not about the kidnapping. Yet, in making his argument below, Davis did not contend that he would be denied his right to testify in his own defense and would be denied a fair determination of his guilt.

In criminal cases, issues raised, including constitutional issues, must be presented to the circuit court in order to be preserved for appeal. *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004). We will not address arguments that are raised for the first time on appeal. *Id.* Davis did not raise this particular argument below; thus, it is not preserved for appellate review.

### III. *Prejudicial Evidence Under Rule 403*

Davis's next point on appeal challenges the circuit court's decision to admit photographs of the murder victim and a recording of the kidnapping victim's 911 telephone call. He asserts that the evidence was both unduly prejudicial and cumulative, and therefore, pursuant to Ark. R. Evid. 403 (2006), it was error for the circuit court to allow it to be presented to the jury.

### A. Photographs of Murder Victim

Davis challenges the admission of four crime-scene photographs of Jennifer Davis's body. The photographs depict the position of Jennifer's body when law-enforcement officers arrived on the scene and each of the gunshot wounds she received. Because the State presented testimony from the medical examiner and the crime-scene investigator regarding the wounds and the crime scene, Davis asserts that the photographs had no relevant purpose, were cumulative, and were introduced solely to inflame the jury.

This court will not reverse a circuit court's decision regarding the admission of crime-scene photographs absent an abuse of discretion. *Garcia v. State*, 363 Ark. 319, 214 S.W.3d 260 (2005).

However, we have expressed caution against rubber stamping the admission of gruesome photographs because of their potential for inflaming a jury. *See Berry v. State*, 290 Ark. 223, 718 S.W.2d 447 (1986). Thus, we require circuit courts to first consider whether relevant evidence creates a danger of unfair prejudice, and then to determine whether the danger of unfair prejudice substantially outweighs its probative value. *Weger v. State*, 315 Ark. 555, 869 S.W.2d 688 (1994). Our court has repeatedly stated that even the most gruesome photographs may be admissible if they assist the trier of fact by shedding light on some issue, by proving a necessary element of the case, by enabling a witness to testify more effectively, by corroborating testimony, or by enabling jurors to better understand testimony. *Garcia v. State, supra.*

Despite Davis's protestations to the contrary, the photographs at issue here were relevant to the State's case. The State has the burden of proving that a defendant had the intent to commit first-degree murder, but intent to commit murder is seldom capable of proof by direct evidence. *Walker v. State*, 324 Ark. 106, 918 S.W.2d 172 (1996). Intent can be shown by the extent and nature of the victim's wounds. *Id.* The pictures here were the only pictures taken of Jennifer's wounds, and in light of the conflicting testimony regarding Davis's mental state during the shooting, they were an imperative part of the State's proof of his intent to commit first-degree murder. Additionally, the photographs assisted the jury in understanding the crime-scene investigator's description of the scene.

Moreover, the record reveals that the circuit court performed a proper evaluation of the photographs before allowing them to be presented to the jury. Upon hearing defense counsel's objection, the circuit court examined each of the photographs and excluded all duplicates. In fact, the circuit court chose to exclude a photograph that depicted a close-up view of Jennifer's neck wound, opting instead to accept a photograph that displayed a more distant view of the same wound. Each photograph was relevant to show Davis's intent, and the circuit court performed a proper evaluation of their prejudicial nature; thus, the circuit court's decision to admit the photographs was not an abuse of discretion.

### B. 911 Recording

Davis next challenges the circuit court's decision to allow the jury to hear a recording of Leslie Stewart's 911 telephone call.

He bases this argument on his opinion that the recording contained twenty minutes of Leslie screaming and crying hysterically and was therefore admitted for the sole purpose of inflaming the jury. He further contends that the recording was not relevant to prove any element of the charged offenses.

As stated above, a circuit court must first determine whether evidence is relevant and then determine whether the evidence's probative value outweighs any possible prejudicial effect on the defendant. *See Weger v. State, supra.* The balancing of probative value against prejudice, under Ark. R. Evid. 403, is a matter left to the sound discretion of the circuit court. *Larimore v. State,* 317 Ark. 111, 877 S.W.2d 570 (1994). The lower court's decision on such a matter will not be reversed absent a manifest abuse of discretion. *Billett v. State,* 317 Ark. 346, 877 S.W.2d 913 (1994).

In the 911 call, Leslie told the operator the circumstances of the crimes and that she was bound and could not escape. Thus, contrary to Davis's argument, the evidence contained in the 911 recording was relevant to prove the "restraint" element of the kidnapping offense and to counter Davis's argument that he released Leslie.

■ Further, Davis has not produced any authority to support his position that the 911 recording was unduly prejudicial because Leslie's voice was hysterical. In *Passley v. State,* 323 Ark. 301, 915 S.W.2d 248 (1996), we upheld the circuit court's decision to admit a 911 recording over the defendant's objection that the recording was prejudicial because the caller's voice was "frantic." *Id.* at 309-10, 915 S.W.2d at 252-53. Accordingly, in light of our holding in *Passley,* we must hold that the circuit court did not abuse its discretion here.

Davis further argues that the 911 recording was cumulative to the other evidence admitted at trial, and therefore it should have been excluded under Ark. R. Evid. 403. Our court has repeatedly held that the State is entitled to prove its case as conclusively as possible. *Henry v. State,* 337 Ark. 310, 989 S.W.2d 894 (1999). We have also stated that merely cumulative evidence is not prejudicial. *Smith v. State,* 354 Ark. 226, 118 S.W.3d 542 (2003). Therefore, we cannot say that the circuit court abused its discretion in deciding to admit the 911 recording.

### IV. Instruction on Lesser-Included Offense

■ For his final point on appeal, Davis contends that the circuit court erred when it refused to instruct the jury on the

lesser-included offense of manslaughter. Once again, we have repeatedly held that in order to preserve for appeal any objection to the circuit court's failure to give an instruction, the appellant must make a proffer of the instruction to the circuit court judge. *Vickers v. State*, 313 Ark. 64, 852 S.W.2d 787 (1993). At trial, Davis asked the circuit court to give the jury a manslaughter instruction, but he never proffered a copy of the proposed instruction. For that reason, Davis did not properly preserve his argument regarding the instruction for appeal, and, accordingly, we decline to address that argument now. *Vickers v. State, supra.*

### V. Rule 4-3(h) Review

In compliance with Ark. Sup. Ct. R. 4-3(h), the record has been examined for all objections, motions, and requests made by either party that were decided adversely to Davis, and no prejudicial error has been found. *Doss v. State*, 351 Ark. 667, 97 S.W.3d 413 (2003).

Affirmed.