Gary WILLIAMS *v.* STATE of Arkansas

CR 94-622                                        894 S.W.2d 923

Supreme Court of Arkansas
Opinion delivered March 20, 1995

*Val P. Price* and *Brent Crews*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

Tom Glaze, Justice. Appellant Gary Williams killed his parents, and was subsequently charged and convicted with two counts of capital murder. Prior to trial, Williams requested a psychiatric examination, which was granted. The Arkansas State Hospital's initial determination resulted in finding him incompetent to stand trial. After about nine months of treatment, state hospital officials found Williams had improved to the point where he was competent to stand trial. Those officials, however, still omitted any conclusion regarding whether Williams appreciated the criminality of his conduct at the time he killed his parents. Consequently, Williams asked for a second evaluation, stating he was entitled to an opinion on the criminal responsibility issue. The trial court denied that request. At trial, Williams raised the insanity defense, but the jury rejected it, finding him guilty of both counts of capital murder and sentencing him to life without parole.

On appeal, Williams first contends the trial court erred by failing to instruct the jury concerning what would happen to Williams if the jury acquitted him on the grounds of mental disease or defect. Williams proffered a modified AMCI 4009 instruction, adding a paragraph, reflecting that, if Williams is found not guilty by reason of mental disease or defect, the trial court must commit him to the Department of Human Services for further examinations and treatment. The trial court's ruling rejecting Williams's instruction was correct.

This court has repeatedly held that the jury is not to be told the options available to the trial court when a defendant is found not guilty by reason of mental disease or defect because

such an instruction raises questions foreign to the jury's primary duty of determining guilt or innocence. *Hubbard* v. *State*, 306 Ark. 153, 812 S.W.2d 114 (1991); *Robertson* v. *State*, 304 Ark. 332, 802 S.W.2d 920 (1991); *Love* v. *State*, 281 Ark. 379, 664 S.W.2d 457 (1981); *Curry* v. *State*, 271 Ark. 913, 611 S.W.2d 745 (1981); *Campbell* v. *State*, 216 Ark. 878, 228 S.W.2d 470 (1950). Williams cites to an annotation in 81 ALR4th 659 which states that a substantial number of jurisdictions have held or recognized that the trial judge in a criminal case involving the insanity defense must instruct the jury as to hospital confinement or other dispositional consequences of an acquittal on grounds of insanity. That same annotation, however, recognizes that courts in a large number of jurisdictions (including Arkansas) still adhere to the view that such instructions are generally inappropriate and unnecessary. The rationale announced in the annotation for rejecting such an instruction is consistent with that adopted by this court — it would permit or encourage the jury to base its verdict on speculation regarding the defendant's subsequent disposition rather than on the law and evidence as to his mental responsibility at the time of the crime. For twenty-five years, this court has adhered to this sound reasoning, and we decline Williams' suggestion to repudiate it now.[1]

Williams next argues the trial court erred when it denied his request for a second opinion on the issue of his criminal responsibility at the time of the crime. He points to Doctors Hall's and Simon's evaluation letter which stated that, "We feel unable to reach a definitive decision with regard to Mr. Williams' criminal responsibility in this case and thus respectfully leave the decision to the trier of fact."

Williams cites Ark. Code Ann. § 5-2-305(d)(4) (Repl. 1993) which provides that the mental examination report shall include an opinion as to the extent, if any, (1) to which the capacity of

---

[1] Williams argues that, by enacting new bifurcated sentencing procedures (Ark. Code Ann. §§ 16-97-101 -104 (Supp. 1993)), the General Assembly appears to have established a policy in favor of informing juries of the consequences of a verdict of not guilty by reason of mental disease or defect. We find such argument disingenuous, since those new procedures merely provide for additional information that may be given juries at the sentencing phase of the trial and which may have been inadmissible at the guilt phase. *See* § 16-97-103.

the defendant to appreciate the criminality of his conduct or (2) to conform his conduct to the requirements of law was impaired at the time of the conduct alleged. He argues the state hospital's report did not contain an opinion bearing on his mental capacity when the crimes occurred. The state responds, stating that the statute requires no unequivocal opinion, but provides only that such reports contain an opinion as to the extent to which the defendant's mental capacity was impaired. The state is correct.

Doctors Hall and Simon concluded that there was little doubt that Williams was mentally ill, and they classified him as atypical psychosis, psychotic disorder not otherwise specified. They said this classification means Williams has some kind of mental problem, defect or disease, but they cannot fit him in any categories. The doctors further stated that it could certainly be argued Williams' criminal behavior was a direct product of his mental illness, and thus, he should not be held responsible for his actions. The doctors then opined that other factors suggested Williams appreciated the criminality of his conduct, and more than likely he could have conformed his conduct to the requirements of law at the time of the crimes. In support of this statement, the doctors related in their evaluation letter that Williams had (1) called the police and informed them he had murdered his parents, (2) refused to give a statement until he could speak to an attorney, (3) feared that his parents had planned to put him back in jail (when in fact evidence existed showing his parents were afraid of him and wanted him out of their home), and (4) appeared to appreciate the fact that he could be charged with murder for his acts and sent to prison, if found guilty.

The foregoing evidence reflects the doctors rendered an opinion that Williams suffered from an atypical psychosis (psychotic disorder), mental illness, but the doctors could not otherwise specify or fit him in any category. Nonetheless, the doctors' report did contain factors and opinions bearing on "the extent" to which Williams may have been mentally impaired when he murdered his parents.

In *Walker* v. *State*, 303 Ark. 401, 797 S.W.2d 447 (1990), this court held § 5-2-305(d)(4) was satisfied when a psychiatrist gave a conditional evaluation. There, the psychiatrist said it was

difficult for her to evaluate the defendant's mental condition at the time the offense was committed because she had not known him at the time. She further stated that the defendant would have been able to appreciate the criminality of his conduct *if* defendant's condition was the same at the time of the offense as it was on the date of her report and evaluation.

■ As in *Walker*, the psychiatrists here experienced difficulty in giving an unqualified opinion, bearing on the criminal responsibility issue of the defendant. And while Williams argues a conclusive opinion is necessary under § 5-2-305(d)(4), this court has made it quite clear that a jury is not bound to accept opinion testimony as conclusive even when it exists and is introduced. *Robertson*, 304 Ark. 332, 802 S.W.2d 920. Thus, even when several competent experts concur in their opinions and no opposing expert evidence is offered, the jury is still bound to decide the issue upon its own fair judgment. *Id.*

■ Before leaving this issue, we point out that Williams' argument seems to rest on the suggestion that the psychiatrists' report undermined his insanity defense. He simply fails to show any prejudice. First, Williams points to no new data, or to errors contained in the doctors' report, that might indicate any different, or more conclusive, opinion would be forthcoming if another expert had been engaged. Second, as matters stood when Williams was tried, his counsel thoroughly utilized in his closing argument the conclusions reached by Hall and Simon in their report. For example, Williams argued that, to prove his insanity defense, he need only do so by a preponderance of the evidence. He argued that Hall's and Simon's opinions showed it was "fifty-fifty" as to whether Williams was criminally responsible for his parents' deaths and that the doctors said unequivocally that Williams suffered from mental disease or defect. Williams used the doctors' qualified or conditional report to his advantage by arguing to the jury that "this is not a case where the doctors have come back and said, there's no question in our minds he's not guilty by reason of insanity." He further repeated the doctors' observations that it could be argued Williams' criminal behavior was a direct product of his mental illness, and he should not be responsible for his actions. In sum, Williams relied on Hall's and Simon's conclusions throughout his closing argument in support of his insan-

ity defense, and he offers nothing to show how his defense would have been enhanced merely by the appointment of another expert.

■ We next turn to Williams' argument that his four siblings, the victims' children, should not have been excluded from the courtroom during the trial. He argues his siblings should have been considered "victims of the crimes" under A.R.E. Rule 616 and allowed to be present during the trial. This argument is meritless. First, Williams cites no authority to support his argument that the "victim of the crime" language in Rule 616 refers to anyone other than the primary victims — in this case, the murdered parents. Second, he offers no authority giving him standing to assert the rights, if any, the siblings may have under Rule 616. Third, he fails to allege, much less show, any prejudice resulting from his siblings' exclusion from the trial.

Williams' next arguments are that the trial court erred in ruling that he was competent to stand trial and in failing to grant a directed verdict regarding his affirmative defense of insanity. We sustain the trial court's rulings on both points.

■ First, the rule is well settled that an accused is presumed competent to stand trial, and the burden of proving incompetence is upon the accused. *Baumgarner* v. *State*, 316 Ark. 373, 872 S.W.2d 380 (1994). After the state meets its burden of proving the elements of an offense beyond a reasonable doubt, the burden then becomes the defendant's to prove the affirmative defense by a preponderance of the evidence; the question is one for the jury and the jury may direct a verdict only if no factual issue exists. *Id.* The question for a reviewing court to resolve on a denial of a directed verdict is whether there is substantial evidence to support the verdict. *Id.*

Here, the record reflects the following evidence was before the trial court when it rejected Williams' motion for directed verdict. In April 1993, the Arkansas State Hospital's staff reviewed relevant records, discussed Williams' progress and interviewed him for about an hour and a half. Doctors Hall and Simon reported that Williams seemed oriented to time, place and person; appeared to have a reasonably good understanding of the legal system; and was well aware of the charges he faced. They said that Williams acknowledged that he had an attorney, and expressed a willingness to work with him. The doctors further related Williams was

aware that he could be convicted if found guilty, and they concluded Williams could cooperate effectively with his attorney. Hall and Simon opined Williams was competent to stand trial.

On September 9, 1993, two days before trial, Dr. Hall appeared at a competency hearing and confirmed his earlier opinion that Williams was fit to proceed to trial. Dr. Simon also testified that, although Williams was difficult to diagnose, and had long-term psychiatric problems, he was willing to work with his attorneys and was interested in defending himself. Marla Gergely, supervisor of the social department at the state hospital, testified that Williams had taken an eight-week competency class given at the hospital, and the class met once a week for an hour, where participants were taught about courtroom procedures and the different things that can happen in court. A test is given at the end, and a score of eighty percent means participants do not have to repeat the class. Williams scored eighty-two percent on the pretest, but still took the class. Questions asked of Williams included such things as what are the charges against you, why were you arrested, did you give a statement to the police, who is your lawyer, what are the three ways you can plead, and what are some of your rights during the trial. We hold this pretrial evidence was more than sufficient to sustain the trial court's denial of Williams' directed verdict motion.

We reach the same result when considering Williams' argument that the trial court erred in denying his directed verdict motion on his affirmative defense of lack of criminal capacity or responsibility. Again, we hold substantial evidence exists to sustain the trial court's ruling on this point. We have already discussed much of the evidence relevant here in disposing of Williams' first two arguments, so we need not repeat all of that testimony or evidence. Suffice it to say, that the expert testimony, alone, related substantial evidence bearing on Williams' capacity and responsibility when he committed the offenses. In sum, the doctors said that Williams had reported his crimes to the police, thus indicating he knew he had committed the offense and knew who to call; he refused giving a statement to the police until he spoke to his attorney; his fear that his parents may have been planning to put him in jail was not delusional, as they were afraid of him and wanted him out of the house; and while he felt

justified in what he did, he appeared to appreciate the fact that he could be charged and convicted of murder and sent to prison.

In conclusion, the trial record has been examined pursuant to Ark. Sup. Ct. R. 4-3(h), and we find no reversible error on other rulings that were adverse to Williams. Thus, for the reasons given hereinabove, we affirm.