William F. BOWEN *v.* STATE of Arkansas

CR 93-1003 911 S.W.2d 555

Supreme Court of Arkansas
Opinion delivered November 20, 1995
[Petition for rehearing denied appellant January 8, 1996.]
[Petition for rehearing denied appellee January 8, 1996.*]

█

*Glaze, J., would grant.

484

*Simes & Simes*, by: *L.T. Simes II* and *Charlotta Norby*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Deputy Att'y Gen., Senior Appellate Advocate, for appellee.

DAVID NEWBERN, Justice. Teller Connie Fay Vondran was stabbed and killed in the course of a robbery of Delta State Bank in Elaine. Shortly after the Bank's alarm alerted the police, William F. Bowen was arrested in a nearby bean field. Mr. Bowen was convicted of capital felony murder and aggravated robbery and sentenced to death.

■ The State has raised an issue concerning the timeliness of the appeal. We consider the appeal to be timely. The judgment was entered January 15, 1993. Mr. Bowen filed a motion for a new trial on February 15, 1993. Pursuant to Ark. R. Crim. P. 36.22, a criminal defendant has the same time to file a new trial motion as for filing a notice of appeal, *i.e.*, 30 days. Ark. R. App. P. 4(a). The 30th day from the judgment fell on February 14, 1993, which was a Sunday, thus extending the date until Monday, February 15, 1993. The Trial Court did not rule on the motion, so it was deemed denied March 17, 1993. Ark. R. App. P. 4(c). Mr. Bowen's notice of appeal was filed March 29, 1993, and thus it was within the 30-day period prescribed in Ark. R. App. P. 4(c).

■ Mr. Bowen has raised 19 points of appeal. As the State has pointed out, we must reverse and dismiss the aggravated robbery conviction because it is a lesser felony included in capital felony murder. *Martin* v. *State*, 277 Ark. 175, 639 S.W.2d 738 (1982).

We affirm the capital murder conviction, but we must reverse the death sentence and remand the case for resentencing. The reversal of the sentence is caused by error in instructing the jury with respect to a statutory aggravating circumstance, which was applied by the jury, although the statute was not in effect at the time the crime was committed.

The sufficiency of the evidence against Mr. Bowen is not an issue. We will recite some of the facts proven and add others as we address Mr. Bowen's points of appeal in the order he has presented them in his brief.

Mr. Bowen's arrest occurred because a citizen had seen someone running toward the bean field and so informed Chief Lawman. Chief Lawman read the *Miranda* rights to Mr. Bowen upon arresting him. Mr. Bowen made no response to indicate that he understood or waived his rights. Chief Lawman asked Mr. Bowen where the money and knife were. Mr. Bowen responded that he had dropped the money while crossing a ditch and he did not have the knife.

From the bean field, Mr. Bowen was transported to the Elaine City Hall to await the arrival of deputies from the Phillips County Sheriff's Department. Shortly thereafter, Mr. Bowen made inculpatory statements to Phillips County Sheriff Kenneth Winfrey and later to FBI agents.

The Trial Court ordered a mental evaluation of Mr. Bowen, which was performed in December 1990 by Dr. Heisler at the Phillips County Jail. Dr. Heisler determined that Mr. Bowen had dissociative disorder, significant depression, and a history of psychiatric treatment. He recommended further evaluation at the State Hospital. Just prior to his transfer to the State Hospital, Mr. Bowen attempted suicide by hanging himself with a bed sheet at the Phillips County Jail.

The State Hospital evaluation occurred during January and February 1991. The doctors concluded Mr. Bowen suffered from Multiple Personality Disorder (MPD) and recommended he be found not competent to stand trial. Mr. Bowen's evaluation at the State Hospital also revealed that during the six years before his arrest, he was diagnosed as suffering from schizophrenia, adjustment disorder, depression, and borderline personality disorder. In addition, his doctors discovered that he had made several suicide attempts. After the State Hospital found him incompetent, Mr. Bowen was discharged and returned to jail in April 1991, whereupon he made another suicide attempt.

In June of 1991, the Trial Court adjudicated Mr. Bowen incompetent and sent him back to the State Hospital for treat-

ment. During an eleven-month stay, Mr. Bowen's doctors observed in Mr. Bowen a number of distinct personalities, but concluded in a report dated April 17, 1992, that his competency had been restored. In that same report, the doctors also rendered the opinion that Mr. Bowen was unable to appreciate the criminality of his act at the time the crime occurred. Mr. Bowen was adjudicated competent to stand trial on July 31, 1992.

In the period between July 31, 1992, and the date jury selection began, December 7, 1992, Mr. Bowen's attorney made several motions requesting further psychiatric evaluation. He also moved for acquittal pursuant to Ark. Code Ann. § 5-2-305 (Repl. 1993). The motions were denied.

At his trial, Mr. Bowen presented an insanity defense through the testimony of experts who evaluated and treated him at the State Hospital, the primary witness being Dr. O. Wendell Hall, III. Dr. Hall discussed the MPD diagnosis and stated, in the State Hospital report, "We concluded . . . that he was not able to appreciate the criminality of his conduct or conform his conduct to the requirements of the law." The prosecution answered with the testimony of Dr. Darryl Bruce Mathews. Dr. Mathews questioned the validity of MPD as a diagnosis in general and said he could not understand the statements and reasoning of the State Hospital doctors in reaching the conclusion that MPD caused Mr. Bowen to be unable to conform his behavior to the law. The jury found Mr. Bowen guilty of capital felony murder and sentenced him to death. In reaching their decision on the death sentence, the jury found two aggravating circumstances and two mitigating circumstances. Neither of the mitigating circumstances found by the jury involved Mr. Bowen's mental health.

Mr. Bowen appeals various rulings made at both the guilt phase and the sentencing phase of his trial.

### 1. Failure to find or consider mitigation on the basis of mental illness

Arkansas Code Ann. § 5-4-603 (Repl. 1993) permits the imposition of a death sentence by a jury if it unanimously returns written findings of certain aggravating circumstances including the conclusion that they outweigh any mitigating circumstances it may find. Statutory aggravating circumstances are

listed in Ark. Code Ann. § 5-4-604 (Repl. 1993), and mitigating circumstances are listed in Ark. Code Ann. § 5-4-605 (Repl. 1993).

Forms to be used in considering and returning its verdict were given to the jury. On Form 1, listing the statutory aggravating circumstances, the jury reported unanimously finding that:

> The Capital Murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody.

> The Capital Murder was committed in an especially cruel or depraved manner.

On Form 2-A, listing the statutory mitigating circumstances, the jury reported unanimously finding that:

> The Capital Murder was committed while William Francis Bowen was acting under unusual pressures or influences or under the domination of another person.

> William Francis Bowen has no significant history of prior criminal activity.

On Form 3, the jury concluded the aggravating circumstances justified beyond a reasonable doubt a sentence of death, and the verdict of the jury was that Mr. Bowen be sentenced to death by lethal injection. *See* Ark. Code Ann. § 5-4-603 (Repl. 1993).

The argument on this point has to do with the jury's failure to find, or even to consider these statutory mitigating circumstances which appeared on Form 2-A, and which are prescribed in § 5-4-605, but which were not checked by the jury as ones which existed in this case:

> The Capital Murder was committed while the defendant was under extreme mental or emotional disturbance.

> The Capital Murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication, or drug abuse.

### a. Failure to find

Mr. Bowen argues the jury should have found those mitigating factors to exist because the evidence of them was overwhelming and uncontradicted. No doubt, there was a great deal of evidence that Mr. Bowen had mental problems in the past. On the other hand, there was Dr. Mathews's testimony.

Dr. Mathews testified, in addition to his testimony related above, that the MPD diagnosis upon which the report founded its conclusion of lack of ability to appreciate the criminality of the act was "suggested" by the doctors to Mr. Bowen. He testified that the symptoms exhibited by Mr. Bowen fit into the "borderline personality disorder" diagnosis previously applied to Mr. Bowen. Dr. Mathews found some evidence of malingering. While he said he did not think the symptoms displayed by Mr. Bowen were totally artificial or the result of malingering, he concluded there was no evidence of mental impairment in the weeks before the crime.

■■ A jury is not required to find a mitigating circumstance just because the defendant puts before the jury some evidence that could serve as the basis for finding the mitigating circumstance. *Duncan* v. *State*, 291 Ark. 521, 726 S.W.2d 653 (1987); *Hill* v. *State*, 289 Ark. 387, 713 S.W.2d 223 (1986). Although medical evidence on the issue of insanity is highly persuasive, a jury is not bound to accept opinion testimony of experts as conclusive, and it is not compelled to believe their testimony any more than the testimony of other witnesses. *Davasher* v. *State*, 308 Ark. 154, 823 S.W.2d 863 (1992). Even when several competent experts concur in their opinions, and no opposing expert evidence is offered, the jury is bound to decide the issue upon its own judgment. *Id.* Testimony by experts is to be considered by the jury in the same manner as other testimony and circumstances in the case. *Id.* The jury alone determines what weight to give the evidence, and may reject it or accept all or any part of it they believe to be true. *Id.*; *Robertson* v. *State*, 304 Ark. 332, 802 S.W.2d 448 (1991).

### b. Failure to consider

Mr. Bowen cites a number of cases from around the country in which death penalties have been rejected on appeal because

of a jury's failure to consider mental illness of the accused. *E.g., Magwood* v. *Smith*, 791 F.2d 1438 (11th Cir. 1986); *Evans* v. *State*, 598 N.E.2d 516 (Ind. 1992). His argument that the jury failed even to consider the evidence of his mental illness is based on the fact that the jury left Form 2-C blank.

■ Form 2-C lists the statutory mitigating factors having to do with mental illness, quoted above, and they are to be checked if the jury determines unanimously that they did not exist at the time of the murder. The problem with the argument based on Form 2-C is that, although Mr. Bowen's abstract of the record indicates that the form was submitted to the jury, there is nothing in the abstract to show whether the jury executed it or not. Indeed, we have searched the record in vain for Form 2-C. It is the duty of the appellant to present a record from which we can determine the facts on which he relies for reversal. *Lindsey* v. *State*, 319 Ark. 132, 890 S.W.2d 132 (1994).

■ We cannot say the jury failed to consider the record of Mr. Bowen's mental illness. Even if the opinions of the doctors at the State Hospital had remained uncontradicted, which they did not, the jury would have been free to disbelieve them and find that punishment of Mr. Bowen should not be mitigated by his mental condition.

### 2. *Application of a statutory aggravating circumstance* ex post facto

One of the statutorily prescribed aggravating circumstances unanimously found by the jury was, "The capital murder was committed in an especially cruel or depraved manner." Mr. Bowen contends it should not have been applied to his case because the law describing that aggravating circumstance had not been enacted at the time the crime was committed.

In *Wilson* v. *State*, 295 Ark. 682, 751 S.W.2d 734 (1988), we held that a statutory aggravating circumstance using the terms "heinous, atrocious, or cruel" was unconstitutionally vague. In 1991, the General Assembly amended the law to state the current terminology. Ark. Code Ann. § 5-4-604(8) (Repl. 1993). Between 1988 and 1991, Arkansas law did not prescribe as an aggravating circumstance either "heinous, atrocious, or cruel," or "cruel and depraved" murder. As the crime in this case occurred in 1990, Mr. Bowen argues that the application of the aggravat-

ing circumstance codified in 1991 violated the *ex post facto* clauses of the United States and Arkansas Constitutions. U.S. Const. art. I, § 9, cl. 3; art. I, § 10, cl. 1. Ark. Const. art. 2, § 17.

The State argues that Mr. Bowen is procedurally barred from raising this issue on appeal because there was no objection on that basis in the Trial Court. Although the State is correct in its assertion that no such objection was made, this assignment of error comes within a very narrow exception to the rule that this Court will not entertain claims of "plain error" not brought to the attention of the Trial Court.

As reported in *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980), we recognized in *Smith* v. *State*, 205 Ark. 1075, 172 S.W.2d 248 (1943), and in *Wells* v. *State*, 193 Ark. 1092, 104 S.W.2d 451 (1937), that we have not required an objection to a trial court's failure to bring to a jury's attention a matter essential to its consideration of the death penalty. We apply that holding here and consider the issue on its merits.

Whether or not retroactive application of the statutory "cruel and depraved manner" aggravating circumstance violates the constitutional prohibition against *ex post facto* legislation depends upon the nature of the law. If the amendment creating the statutory aggravating circumstance after the commission of the crime is considered "substantive," then application of it is a constitutional violation. If it is considered "procedural," there was no error in applying it retroactively to Mr. Bowen's case. That is the analysis used by the Supreme Court in *Miller* v. *Florida*, 482 U.S. 423 (1987), and in *Dobbert* v. *Florida*, 432 U.S. 282 (1977).

In *Miller* v. *Florida, supra*, the Florida legislature, through an amendment in a "points" system, effectively increased the number of years in the sentence range for certain offenses from a range of three-and-a-half years to four-and-a-half years to a range of five-and-a-half to seven years. The increase occurred after the offense in question was committed but before Miller was tried. In its opinion determining that the new law could not be applied, the Supreme Court said:

> Article I of the United States Constitution provides that neither Congress nor any State shall pass any "ex post facto Law." . . . Our understanding of what is meant by *ex*

*post facto* largely derives from the case of *Calder* v. *Bull*, 3 Dall. 386 (1798), in which this Court first considered the scope of the *ex post facto* prohibition. In *Calder*, Justice Chase, noting that the expression "*ex post facto*" "had been in use long before the revolution," . . . summarized his understanding of what fell "within the words and the intent of the prohibition":

> "1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2d. Every law that aggravates a crime, or makes it greater than it was, when committed. 3d. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different testimony, than the law required at the time of the commission of the offense, in order to convict the offender." *Id.* at 390 (emphasis omitted).

\* \* \*

As was stated in *Weaver* [*v. Graham*, 450 U.S. 24 1981)], to fall within the *ex post facto* prohibition, two critical elements must be present: first, the law "must be retrospective, that is, it must apply to events occurring before its enactment", and second, "it must disadvantage the offender affected by it." . . . We have also held in *Dobbert* v. *Florida, supra,* that no *ex post facto* violation occurs if a change does not alter "substantial personal rights," but merely changes "modes of procedure which do not affect matters of substance."

By way of contrast to *Miller* v. *Florida, supra,* the *Dobbert* case had to do only with whether the judge or the jury made an ultimate decision about imposition of the death penalty. At the time the crime was committed, the Florida law permitted imposition of the death sentence unless a majority of the jurors recommended mercy. At the time of the trial, the law permitted the judge to impose the death penalty if he or she stated in writing reasons based on statutorily prescribed findings. That change was held to be "procedural" only, and thus it was not prohibited as an *ex post facto* law. The Supreme Court concluded the change

in the law actually worked to the benefit of the accused. Previously, the death penalty was "presumed" unless the jury called for mercy, but under the new law the judge was to implement statutory safeguards enacted in the wake of *Furman* v. *Georgia*, 408 U.S. 238 (1972).

In *Miller* v. *State*, 269 Ark. 341, 603 S.W.2d 430 (1980), an issue was whether there was sufficient evidence in support of aggravating circumstances found by the jury. In upholding the jury's findings, we said:

> One of the reasons these statutes were enacted was to give this court an insight in the thought process of the jury so that we can compare the circumstances of cases involving the death sentence in our effort to avoid any arbitrary and unconstitutional application of the sentence. We do not consider the jury's findings as separate little verdicts, and we do not require the same degree of proof to sustain a jury finding that an aggravating circumstance exists as we would require to sustain a conviction if that circumstance was a separate crime.

That expression about our statutory aggravating circumstances is similar to one made a few years later by the Supreme Court in *Poland* v. *Arizona*, 476 U.S. 147 (1986), in which it was said that the finding of an aggravating circumstance is not a separate verdict but is a "standard" to guide the jury in its selection of punishment.

In *Ruiz* v. *State*, 299 Ark. 144, 772 S.W.2d 297 (1989), we explained the circumstances under which a sentencing law will be considered substantive:

> Appellants have cited a number of our cases stating that sentencing provisions are substantive rather than procedural and that the sentencing provisions in effect at the time an offense occurs govern sentencing. *Jennings* v. *State*, 276 Ark. 217, 633 S.W.2d 373 (1982); *Easley* v. *State*, 274 Ark. 215, 623 S.W.2d 189 (1981); *Culpepper* v. *State*, 268 Ark. 263, 595 S.W.2d 220 (1980). However, those cases, and others like them, deal with attempts to apply a harsher sentence than was provided by law at the time an offense was committed, rather than with changes in sentencing procedures.

■ While the addition of an aggravating circumstance to be considered in determining whether the sentence will be death or life without parole does not guarantee the harsher sentence, it may have a direct effect on the decision and thus result in a harsher sentence than might have been imposed were that aggravating circumstance not available. We can hardly say that a "standard" for application of the death penalty is merely procedural. We regard it as a substantive provision that cannot be applied retroactively. It was error to do so, thus we must remand the case for resentencing.

### 3. Motions to suppress inculpatory statements

Mr. Bowen contends that the custodial statements he made to the Phillips County Sheriff, the Chief of the Elaine Police, and the FBI should have been suppressed by the Trial Court. In making this argument, Mr. Bowen argues (a) the statements were obtained without a valid waiver of his *Miranda* rights, (b) the statements and waiver of rights (if made) were not voluntary, knowing, and intelligent, and (c) the statements were the fruit of an illegal arrest.

■ In his order denying the motion to suppress the statements, the Trial Court did not address the statements made to Chief Lawman just after the arrest. It was Mr. Bowen's obligation to obtain a ruling with respect to those statements in order to preserve a point of appeal with respect to them. *State* v. *Torres*, 309 Ark. 422, 831 S.W.2d 903 (1992); *Hobbs* v. *State*, 43 Ark. App. 149, 862 S.W.2d 285 (1993).

The statement to Sheriff Winfrey was made after Mr. Bowen said he "wanted to think about" whether to waive his rights and make a statement. As he escorted Mr. Bowman to a holding cell, the Sheriff told Mr. Bowen he did not think he had committed the crime alone, mentioned that he had 25 to 30 officers ready to investigate, and asked Mr. Bowen to do him and himself a favor by saying what happened. At that point Mr. Bowen said there were others involved but that one of them "had nothing to do with it." Mr. Bowen then asked the Sheriff to promise that nothing would happen to her, and Sheriff Winfrey responded that "if she had nothing to do with it, then nothing would happen to her."

Mr. Bowen told the Sheriff that the others were Crickett

Tindall, who is Mr. Bowen's mother, and her friend, Cheryl Lob-dill. Mr. Bowen described their vehicle and told the Sheriff that they were on their way to Fort Smith. Shortly after giving these statements, Mr. Bowen was taken to a hospital in Helena for treatment of his ankle which he apparently had injured while attempting to flee after the robbery.

We are not convinced by Mr. Bowen's arguments about the voluntariness of his remarks to Sheriff Winfrey. He made a passing reference to having been abused by sheriff's deputies and to the pain he suffered from his injured ankle, but all of the police witnesses testified Mr. Bowen seemed alert and not to have been seriously affected by his injury. They also testified there was no abuse or coercion.

Custodial statements are presumed to be involuntary with the burden of proof placed on the State to show that they are not. *Noble* v. *State*, 319 Ark. 407, 892 S.W.2d 477 (1995); *Everette* v. *State*, 316 Ark. 213, 871 S.W.2d 568 (1994). If, however, after an independent review of the "totality of the circumstances" we conclude there was no coercion and the statements were made knowingly and intelligently we do not reverse on the basis of their admission into evidence. *Thomas* v. *State*, 315 Ark. 504, 868 S.W.2d 483 (1994).

In this instance, the evidence presented by the State was sufficient to overcome the presumption. We should note here that statements made to the FBI agents later were made after a clear waiver by Mr. Bowen of his rights. He told those agents in detail about the planning and commission of the crime.

The issue that draws our attention has to do with whether Sheriff Winfrey acted properly in questioning Mr. Bowen after Mr. Bowen had acknowledged an understanding of his right not to answer but had declined to sign a waiver of rights form, saying he needed to "think about" waiver. Does that statement amount to an invocation of his right to remain silent? Perhaps so, but the question is whether a subsequent statement may imply waiver.

Mr. Bowen cites *United States* v. *Ramsey*, 992 F.2d 301 (11th Cir. 1993), for the proposition that if there has been an equivocal invocation of rights it is the duty of a police officer not to inquire further other than to ask questions in an attempt to clarify the waiver. Mr. Ramsey had, after being warned of his

rights and asked to make a statement, looked away from his interrogator and remained silent. Other investigators took him to another room out of the presence of the first questioner on the assumption that he just did not want to talk to her but would talk to them. They urged him to talk, suggesting that it would benefit him to do so, and he made an inculpatory statement. It was held that the investigators had an obligation to clarify his "equivocal invocation" of his rights before asking questions which could lead to an inculpatory statement.

Our view of this matter is that, by saying he wanted to "think about" waiver, Mr. Bowen indicated an understanding of what was at stake. We do not regard the statement as an invocation of his rights, however. In a recent case, the Supreme Court has held that the invocation of the right to counsel must be made with specificity. *Davis* v. *United States*, ___ U.S. ___, 114 S.Ct. 2350 (1994). We see no distinction between the right to counsel and the right to remain silent with respect to the manner in which it must be effected.

Mr. Bowen had acknowledged that he understood his right to remain silent and to the presence of counsel and yet he spoke without further mention of those rights. We have held that by merely answering questions one may waive one's right to remain silent by implication. *Bryant* v. *State*, 314 Ark. 130, 862 S.W.2d 215 (1993); *Ward* v. *State*, 308 Ark. 415, 827 S.W.2d 110 (1992); *Duncan* v. *State*, 291 Ark. 521, 726 S.W.2d 653 (1987).

Before leaving the subject of the inculpatory statements, we must mention briefly several other contentions of Mr. Bowen. He argues the Sheriff made a promise that nothing would happen to his mother if Mr. Bowen cooperated. The Sheriff's testimony was that he said nothing would happen to her if, as Mr. Bowen had said, she had no part in the robbery and murder. Obviously, if that is all that was said it amounted to such a conditional promise that it could not be considered to be coercive.

Mr. Bowen also asserts his mental illness prevented his statements from being intelligently and voluntarily made. Again, the evidence to the contrary in the testimony of the police officials who took the statements posed a question of credibility only. The detail in which he described to the FBI agents the crime and its planning also lent credibility to the State's position that

Mr. Bowen was not incapacitated by his alleged mental illness.

■ Finally, Mr. Bowen contends all his statements were the results of an illegal arrest and should have been suppressed for that reason. We do not consider that point as the trial court made no ruling on it. *Gidron* v. *State*, 316 Ark. 352, 872 S.W.2d 64 (1994).

### 4. Failure to order additional competency examination

Mr. Bowen was adjudicated competent to stand trial on July 31, 1992. The trial did not begin until December 7, 1993. During the trial Mr. Bowen testified as several different "alters" or personalities. His counsel sought, and was often granted time to explain matters to the personality testifying or hearing the testimony of others.

■ An accused is presumed competent to stand trial, and the burden of proving incompetence is on the accused. *Williams* v. *State*, 320 Ark. 67, 894 S.W.2d 923 (1995). Once he was determined to be competent, Mr. Bowen once again had the burden of proving incompetency. In addition to the conclusion that Mr. Bowen's acceptance of his personality disorder rendered him competent, the Trial Court also had before it the testimony of Dr. Hall, who stated that although Mr. Bowen still suffered from MPD, his condition could be managed. Moreover, the record indicates that Mr. Bowen performed well on examinations that tested his ability to understand the legal system. In addition, we find no evidence that Mr. Bowen was prejudiced by his mental condition in his or his counsel's conduct of the trial. Under these circumstances, we hold there was no error in refusing a further mental examination.

### 5. Denial of motion to acquit

Dr. Anderson and Dr. Hall, who treated Mr. Bowen during his stay at the State Hospital, filed a report in which they declared that he was competent to stand trial but unable to appreciate the criminality of his act at the time the crime was committed. Mr. Bowen contends he should have been acquitted by the Trial Court pursuant to Ark. Code Ann. § 5-2-313 (Repl. 1993), which provides that a trial court may enter a judgment of acquittal on the ground of mental disease or defect if satisfied the defendant lacked the capacity to conform his conduct to the requirements

of the law or appreciate the criminality of his act.

 In cases that have interpreted § 5-2-313, this court has found that the statute provides that a court "may" enter a judgment of acquittal on the grounds of mental disease or defect. *Davasher* v. *State*, 308 Ark. 154, 823 S.W.2d 863 (1992). Moreover, "the statute permits the trial judge to acquit the defendant in cases of extreme mental disease or defect where the lack of responsibility on the part of the defendant is clear." *Westbrook* v. *State*, 274 Ark. 309, 624 S.W.2d 433 (1981).

 Denial of the motion was clearly within the Trial Court's authority and discretion. The medical report stated at one point, "Concerning criminal responsibility, again Mr. Bowen's Multiple Personality Disorder presents problems in clearly making a decision." It went on to say that some of his personalities appeared to understand the wrongfulness of the alleged behavior and thus sought to avoid apprehension, but other alters had no memory of the events. The report may not be said to have presented a "clear" determination, and we hold there was no error in failure to acquit pursuant to the statute.

### 6. Funds for prosecution expert

In response to the State Hospital report which concluded Mr. Bowen was incapable of appreciating the criminality of his acts or conforming his conduct to the law at the time the crime was committed, the State asked for additional evaluation by Dr. Mathews, a professor at the University of Arkansas for Medical Sciences. In the motion it was urged that the MPD diagnosis made by the State Hospital was uncertain and could be the basis of a mistake to be made by the judge and the jury. It was noted that State Hospital records with respect to Mr. Bowen had not been made available to the prosecution. The operative words of the motion were, "The State moves the Court to allow . . . [Dr. Mathews] to examine the Defendant, review all medical and pertinent records concerning the Defendant at the State Hospital, diagnose any and all mental conditions which the Defendant may have, and form an opinion. . . ." The motion concluded by stating, "The cost of the further psychiatric examination and evaluation shall be borne by the State." The motion did not contain a request for funds.

In response, counsel for Mr. Bowen opposed the motion as

"doctor shopping" and noted that a request for $10,000, presumably for the purpose of paying Dr. Mathews, from the Phillips County Quorum Court had been highly publicized.

The Trial Court's order granting the motion said nothing about funding for the further examination. Dr. Mathews testified he was paid $5,000 for his work and testimony in the case, but did not reveal the source.

■ The point of appeal is that the Trial Court erred in "allowance of funds to the prosecution for the purpose of securing its own expert opinion regarding Bowen's mental health." The record simply does not support the assertion that the Trial Court awarded funds to the State for the additional examination. True, we have said that an indigent defendant has no right to funds to shop for a doctor to contradict the report of experts at the State Hospital. *Sanders* v. *State*, 308 Ark. 178, 824 S.W.2d 353 (1992). We have been cited to no case, however, in which we have said that a defendant, who has the means to obtain it, may not present the testimony of an additional expert. Nor is any authority cited to the effect that the State may not do so.

### 7. Overlapping offenses

Mr. Bowen argues that the Trial Court erred in instructing the jury on both capital felony murder and first degree felony murder. Essentially, he contends that the overlap of the two instructions gave the jury unfettered discretion in choosing his punishment.

■ No objection on the basis of the overlapping of the instructions was made at the trial. We decline to review the point. *Robertson* v. *State*, 304 Ark. 332, 802 S.W.2d 920 (1991); *Fretwell* v. *State*, 289 Ark. 91, 708 S.W.2d 630 (1986).

### 8. Improper closing argument

Mr. Bowen contends that the prosecution made improper remarks during closing arguments in the guilt-innocence phase and in the sentencing phase of his trial. He argues that his constitutional rights were violated because the comments improperly and unfairly influenced the jury.

■ No objection was made to any of the prosecution's closing argument made at the conclusion of the guilt-innocence

phase of the trial. Absent contemporaneous objection at the trial, we will not review the prosecution's closing argument unless it was so flagrantly improper and so highly prejudicial in character as to have made it the duty of the Court on its own motion to instruct the jury not to consider it. *See Wicks* v. *State, supra; Wilson* v. *State*, 126 Ark. 354, 190 S.W. 441 (1916).

The arguments made in the guilt-innocence phase of this case do not rise to that flagrant or highly prejudicial level. There was a "victim impact" reference to Ms. Vondran's family, although no evidence had been produced in support of it. There was also a "they will do it every time" argument made to suggest that criminal defendants always question the voluntariness of their statements to the police. Perhaps most objectionable was the Prosecutor's remark that the presumption of innocence no longer applied to Mr. Bowen due to the strong evidence of his guilt. While these arguments could be characterized as improper, they are not of the sort requiring the Trial Court to step in absent an objection.

In the sentencing phase of the trial, the prosecution made closing argument to the effect that application of the death penalty would protect "our family and friends" from "somebody who kills people." Again, there was no objection, and we hold the remark was not of the sort requiring the Trial Court to act independently.

Mr. Bowen's counsel did object to two statements made in closing argument by the Prosecutor. The jury was told that in order to find mitigation based on mental illness the illness had to be "extreme." That was a correct statement of the law, as the jury instruction based on the statutory mitigating circumstance was, "The capital murder was committed while the defendant was under extreme mental or emotional disturbance."

The other statement to which an objection was made was a "story" told by the Prosecutor about how he had discussed the death sentence in another case years earlier with a candidate for attorney general named "Bill." Upon being asked by "Bill" whether he thought application of the death penalty would deter others, he had replied "I said Bill, I sure do." The objection was overruled.

Attorneys are given "leeway" in closing remarks.

*Davis* v. *State*, 314 Ark. 257, 863 S.W.2d 259 (1993). We note that the jury was instructed that remarks by the attorneys are not evidence. Even though there was no evidence before the jury from which it could determine if the "story" were true, we cannot say it was an abuse of the Trial Court's discretion not to sustain the objection. It amounted to very little more than a statement of the Prosecutor's continuing belief in the deterrent effect of capital punishment. To the extent the "story" may have had political overtones, we cannot say they were such as to inflame the passion of the jury.

### 9. Denial of continuance motions

During the trial, Mr. Bowen's counsel made frequent motions for a continuance. The primary reasons given were Mr. Bowen's alleged changes in personality and the accompanying problems that posed for his defense, as well as counsel's limited opportunity to visit with his client immediately before the beginning of the trial because of Mr. Bowen's delayed return from the State Hospital.

A motion for a continuance is addressed to the sound discretion of the trial court, and a decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *King* v. *State*, 314 Ark. 205, 862 S.W.2d 229 (1993); *Gonzales* v. *State*, 303 Ark. 537, 798 S.W.2d 101 (1990); *Wilson* v. *State*, 320 Ark. 142, 895 S.W.2d 524 (1995).

Mr. Bowen has failed to allege prejudice. Counsel requested a continuance or pause in the proceedings frequently, and despite concerns over the length of the trial, the Trial Court attempted to accommodate counsel on many occasions when he requested more time to consult with his client. We conclude there was no abuse of discretion.

### 10. Voir dire *of prosecutor*

The trial began December 7, 1992. The newly elected prosecutor joined in the trial after taking office in January, 1993. By that time, most of the jurors had been selected. During *voir dire*, which occurred before the new prosecutor's participation, each panel of jurors was asked whether they were related to, acquainted with, or had been represented by the two prosecutors who had been assigned to the case at that time.

Questions were asked of the selected jurors and those to be selected whether they knew or had been represented by the new prosecutor, but the jurors were not asked whether any of them were related to him. Mr. Bowen argues that was error.

■ Although a general objection was made to the jury ultimately selected on the ground of lack of impartiality, and the objection contained a reference to "questioning about a different prosecuting attorney" the point now being argued was not presented to the Trial Court, and we thus decline to consider it. *Wicks* v. *State, supra.*

### 11. Overbreadth of aggravating circumstances

Mr. Bowen argues the aggravating circumstances concerning "murder committed in an especially cruel or depraved manner" and "murder committed for the purpose of avoiding or preventing an arrest" should not have been presented to the jury because they violate the Eighth and Fourteenth Amendments to the Constitution of the United States.

■ We rejected the overbreadth and vagueness arguments with respect to the "avoiding or preventing arrest" aggravating circumstance in *Coulter* v. *State*, 304 Ark. 527, 804 S.W.2d 348 (1991). The United States Supreme Court rejected the overbreadth argument with respect to the "especially heinous, cruel or depraved manner" aggravating circumstance in Arizona upon which our statute was modeled. *Walton* v. *Arizona*, 497 U.S. 639 (1990). *See also Greene* v. *State*, 317 Ark. 350, 878 S.W.2d 384 (1994). We hold the statutes, Ark. Code Ann. §§ 5-4-603 and 5-4-604 (Repl. 1993), permitting these aggravating circumstances to be considered by the jury are not unconstitutionally overbroad.

### 12. Failure to define "mitigating circumstances"

In his closing argument on the sentencing phase of the trial, Mr. Bowen's counsel presented a dictionary definition of the term "mitigating" to the jury. He emphasized that the term meant "extenuating or reducing the degree of moral culpability" as opposed to "justification." He now contends the Trial Court should have defined the term "mitigating circumstances" for the jury.

■ We assume jurors to be persons of sufficient intelligence to understand the meaning of ordinary language. *See Hamilton* v. *Hamilton*, 178 Ark. 241, 10 S.W.2d 377 (1928). Even if

the term "mitigating circumstances" required further definition we would not be able to find prejudice here in view of counsel's correct and unchallenged presentation of the definition to the jury.

### 13. Mitigating circumstances not unanimously found

Mr. Bowen argues that the court's instructions on mitigating circumstances suggested to the jurors that they could consider only the mitigating circumstances they unanimously found to exist. In particular, he contends that it is likely the jury found that the three forms relating to mitigating circumstances, one which asks the jury to list those they unanimously found to exist, another which asks for a list of those mitigators that some jurors, but not all, found to exist, and a third which asks the jury to list those mitigators that they unanimously found did not exist, are indistinguishable to a degree that suggested to the jury that a unanimous vote was required before any mitigating circumstance was found.

This same argument was made in *Pickens* v. *State*, 301 Ark. 244, 783 S.W.2d 341 (1990), on the basis of a Maryland case. We decided the argument lacked merit. We wrote:

> Our Form 2, which accompanies AMCI 1509, expressly allows the jury to list mitigating circumstances which were found by some, though not all, of its members. Form 3 then allows the jury to determine if the aggravating circumstances outweigh any mitigating circumstances. Nothing in the forms indicates to the jury that a mitigating circumstance must be found unanimously before it may be considered in the weighing process. The potential for misunderstanding is not present in the Arkansas forms as it is in the Maryland forms.

### 14. Omission of the word "other" from AMCI 106

When he instructed the jury, the Trial Court said that "circumstantial evidence must be consistent with the guilt of the defendant and *inconsistent with any reasonable conclusion.*" (emphasis added). Our model instruction, AMCI 106, reads, in significant part, as follows: "inconsistent with any *other* reasonable conclusion." Mr. Bowen contends that the Trial Court's omission of the word "other" created a reasonable possibility

that the jury understood and applied the instruction in an unconstitutional manner.

This argument was not presented to the Trial Court. We decline to consider it. *Parker* v. *State, supra.*

### 15. Failure to give notice of aggravating circumstances

Mr. Bowen argues that the Trial Court erred in denying the objection that his counsel made to the State's failure to give Bowen's counsel sufficient notice of the aggravating circumstances the State would ask to be submitted to the jury during the penalty phase of the trial.

We need not discuss this point in depth as we are remanding the case for resentencing. We will say, however, that we doubt any prejudice resulted from lack of notice. By the time of the sentencing phase of the trial Mr. Bowen's counsel was well aware of the State's evidence and was, of course, aware of the fact that aggravating circumstances are limited to those listed in § 5-4-604. Matching the evidence with the list of possible aggravating circumstances should have provided the information needed.

### 16. Chain of custody of evidence

Mr. Bowen contends it was error for the Trial Court to allow the State to introduce into evidence the clothing he was wearing when he was arrested on September 19, 1990. The State introduced the clothing during the testimony of Dale Arnold, an investigator for the Arkansas State Police who was in charge of gathering the physical evidence of the crime. In essence, Mr. Bowen argues that the clothes were not properly shown to have been his because the State failed to establish a chain of custody prior to their introduction.

The purpose of establishing a chain of custody is to prevent the introduction of evidence which is not authentic. *Gomez* v. *State,* 305 Ark. 496, 809 S.W.2d 809 (1991). To prove authenticity the State must show a reasonable probability that the evidence has not been altered in any significant way. *Id.* It is not necessary for the State to call every person who could conceivably have come into contact with the evidence; the Trial Court in his or her discretion need only be satisfied that the evidence pre-

sented is genuine and the reasonable probability is that no one has tampered with it. *Phills* v. *State*, 301 Ark. 265, 783 S.W.2d 348 (1990); *Lewis* v. *State*, 307 Ark. 260, 819 S.W.2d 689 (1991).

■■■ Mr. Arnold testified he received the clothes from Tom Hall, the jailer at the Phillips County Jail who booked Mr. Bowen. It is reasonable to conclude that, as Mr. Hall admitted Mr. Bowen into the jail, it was he who received the clothing once Mr. Bowen changed into a prison uniform. Under these circumstances, the possibility of tampering was shown to be minimal, and it cannot be said that the Trial Court abused his discretion.

## 17. Unfair hearsay rulings

Mr. Bowen asserts that the Trial Court made a number of errors in ruling on hearsay objections. In particular, he asserts error in granting hearsay objections made by the State, and in denying ones made by defense counsel.

■■■ Hearsay is a statement made by an out-of-court declarant that is repeated in-court by a witness and is offered into evidence for the truth of the matter asserted. *Piercefield* v. *State*, 316 Ark. 128, 871 S.W.2d 350 (1994); Ark. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by law or by the rules of evidence. *Hall* v. *State*, 315 Ark. 385, 868 S.W.2d 453 (1993). We will not reverse a trial court's determination as to the admissibility of hearsay unless there was an abuse of discretion. *Latham* v. *State*, 318 Ark. 19, 883 S.W.2d 461 (1994).

■■■ Mr. Bowen first complains that when Special Agent Battershell testified during the trial, the State was permitted to introduce into evidence the statement he took from the defendant. Mr. Bowen is apparently arguing that the report was hearsay that should not have been admitted. As the State argues, the statement was admissible as an admission of a party-opponent under A.R.E. 801 (d)(2)(i).

■■■ Mr. Bowen also contends that the Trial Court erred when it refused to admit a progress note prepared by Dr. Anderson on February 6, 1992, in which the doctor records his impressions of a session where the personality "William Luther Tindall" appears. Mr. Bowen does not assert any legal basis for his allegation of error on this ruling. Rather, it appears that he is arguing that it should have been admitted because the Trial Court

allowed the prosecution to introduce hearsay. In any event, the trial transcript reveals that Dr. Anderson was permitted to read the entire progress note into the record; therefore, the Trial Court did not abuse his discretion.

■ Mr. Bowen next contends the Trial Court erred when he permitted the State's expert, Dr. Mathews, to testify concerning notes the State Hospital staff made concerning evidence that Mr. Bowen was malingering. When the defense counsel objected, he did not appear to be making a hearsay objection. Rather, he stated, "If he doesn't know it's true he can't testify to it." The Trial Court overruled the objection, saying that he was an expert who was giving an opinion, and that the objection went more to the weight of the evidence rather than its admissibility. The Trial Court was correct. When an expert's testimony is based on hearsay, the lack of personal knowledge on the part of the expert does not mandate the exclusion of the opinion but presents a jury question as to the weight which should be assigned the opinion. *Arkansas State Highway Comm'n* v. *Schell*, 13 Ark. App. 293, 683 S.W.2d 618 (1985).

Mr. Bowen next argues that the Trial Court should not have allowed Dr. Anderson to testify, in response to a question posed on cross examination, concerning a statement made by Mr. Bowen that was reported in one of his medical records. Specifically, the record contained an interview of Mr. Bowen's father, Fred Bowen, that was conducted by one of the staff at the State Hospital. During the interview, Fred Bowen reported that his son had said, in effect, that "I could kill you and get away with it because of my mental history."

■ The transcript from this portion of Mr. Bowen's trial reveals that although an objection was made, it was rather obscure and referred only to the admissibility of Mr. Bowen's medical history and Dr. Anderson's lack of direct knowledge of the statement. After the objection was overruled, the prosecutor said he would rephrase the question as it had been "badly phrased." He was then allowed to elicit the testimony about the record without any further objection from the defense. Under these circumstances, this argument was not properly preserved for appeal. *Robertson* v. *State, supra.*

■ Mr. Bowen also argues that the Trial Court erred when

he refused to allow Marla Gergely to read to the jury a psycho-social history she had prepared by interviewing people who knew Mr. Bowen. At trial, Mr. Bowen's attorney argued that the psycho-social history was not hearsay because it was not offered for the truth of the matter asserted. We are not told the purpose of the offering, however, and it is apparent that the only purpose for offering the statements of these people was for the truth of the matter asserted. As Mr. Bowen does not argue that any exception applies, we find no error.

In connection with the ruling on the admissibility of statements made in Mr. Bowen's psycho-social history, Mr. Bowen argues that Dr. Anderson should not have been permitted to testify about the contents of a progress note prepared by Nurse Rudder on November 28, 1991. In particular, he takes issue with Dr. Anderson being permitted to read the following statement from the report: "Came to door of office with another patient. Waved and said in baby talk, I just came to wish you happy turkey day. I used to be nine and now I am five and my name is Davey." The statement was offered to show that Mr. Bowen made the statement, and not for the truth of the matter asserted.

In the last paragraph of his argument, Mr. Bowen simply asserts that the court erred when it sustained the State's hearsay objections, but denied all of his. It is, of course, possible that all of the State's objections were valid and all of Mr. Bowen's were not. At any rate, our only possible course of review is to consider each allegation of error on which any specific argument is made, and we have done so.

### 18. Improper restriction of defense testimony

Mr. Bowen contends the Trial Court erred by not allowing Marla Gergley to refresh her memory with notes made by Dr. Hall. We decline to consider this argument because Mr. Bowen made no proffer of the excluded evidence, thus we are unable to evaluate the matter. *Thompson v. State*, 306 Ark. 193, 813 S.W.2d 249 (1991).

### 19. Exclusion of juror

During *voir dire*, venireperson Hicks said that, because of his religious beliefs, he did not feel qualified to take another's life. He did not unequivocally state that he would not sentence Mr.

Bowen to death, but said, "To be a juror you all are looking for me to complete my whole job all the way through and the death penalty when it comes up to it and I don't know whether I will be able to go to a death penalty with that," and "That I wouldn't know until I faced it, but I am taught, you know, to not try to pass judgment on another person's life. . . ." Mr. Bowen argues that because Mr. Hicks did not definitely say that he would not consider the death penalty, the Trial Court erred in excusing him for cause.

In previous cases that have dealt with this issue, we have deferred to the ability of the a judge to hear the responses made by the venirepersons during *voir dire* and to observe their demeanor. Additionally, in *Pickens* v. *State, supra*, we recognized that the standard for deciding if a venireperson should be excused in this situation has become more relaxed:

> The standard for determining if a venireperson should be excused for cause in this situation is no longer whether the venireperson makes it unmistakably clear that he or she would automatically vote against the death penalty. Instead, the court should decide if the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and oath. It is no longer necessary that the juror's bias be shown with unmistakable clarity. . . . The Court in *Wainwright* v. *Witt*, 469 U.S. 412 (1985), clarified its holding in Witherspoon to impose this more flexible standard, as we have recognized. *See Williams* v. *State*, 288 Ark. 444, 705 S.W.2d 888 (1986).

██ The Trial Court did not err by excusing Mr. Hicks for cause.

### Compliance with Rule 4-3(h)

The record has been reviewed in accordance with Arkansas Supreme Court Rule 4-3(h), and it has been determined that there were no errors with respect to rulings on objections or motions prejudicial to the appellant not discussed above.

Affirmed in part, reversed in part, and remanded.